66 So.2d 884

**STATE v. BIRMINGHAM RAIL & LOCO-
MOTIVE CO.**

3 Div. 605.

Supreme Court of Alabama.

Aug. 6, 1953.

**444**

Si Garrett, Atty. Gen., and H. Grady Tiller and Willard W. Livingston, Asst. Attys. Gen., for appellant.

Burr, McKamy, Moore & Tate, Birmingham, for appellee.

GOODWYN, Justice.

This is an appeal by the state from a final decree of the Circuit Court of Montgomery County, in Equity, vacating and setting aside a sales tax assessment made by the State Department of Revenue against the appellee, Birmingham Rail and Locomotive Company, herein referred to as the "Company."

The question involved is whether certain rails sold by the company to Alabama mine operators and used by them in underground coal mines as track for tram cars are subject to the Alabama Sales Tax Act. The assessment covers the period from

July 1, 1944, through June 30, 1949. The company was not the manufacturer of the rails.

The company contends that these rails are machines or machinery used in mining, or parts of such machines, attachments and replacements therefor, and as such are exempt from the sales tax by virtue of Code 1940, Tit. 51, § 755(p), as amended, which provides for exemption of the following:

"(p) The gross proceeds of the sale of machines used in mining, quarrying, compounding, processing and manufacturing of tangible personal property; provided that the term 'machines,' as herein used, shall include machinery which is used for mining, quarrying, compounding, processing or manufacturing tangible personal property, and the parts of such machines, attachments and replacements therefor, which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used."

We note here that the exemption of "machinery used in * * * mining" appeared in the original Sales Tax Act, Act No. 126, approved February 23, 1937, Gen. and Loc.Acts, Ex.Sess. 1936–1937, p. 125, under Subsection (h) of Section 1, by including the sale of such machinery within the definition of "wholesale sale." The original act contained a provision for its expiration on September 30, 1939. It was substantially re-enacted in early 1939. Act No. 18, approved February 8, 1939, Gen.Acts 1939, p. 16. In this re-enactment, "machinery used in * * * mining" was left out of the definition of "wholesale sale," but there was added to the section on exemptions, Sec. V(r), a provision for exemption of such machinery in the same form as it now appears in Sec. 755(p), Tit. 51, supra. Sec. V(r) of the 1939 Act was carried into the 1940 Code without change as Sec. 755(r), Tit. 51; and has been included without change in each amendment of Sec. 755, Act No. 471, approved July 10, 1943, Gen.Acts 1943, p. 435; Act No. 303, approved August 13, 1947, as Subsec. (p),

Gen.Acts 1947, p. 155; Act No. 211, approved July 12, 1949, as Subsec. (p), Gen. Acts 1949, p. 302.

The company takes the position that the mining of underground coal consists not only of detaching the coal from the earth, but removing it to the surface; that the digging or cutting of the coal from the seam and moving it out of the mine is one continuous operation; that any machinery used in this continuous operation is, therefore, "machinery which is used for mining"; that the tramcars used to remove the coal from underground are a part of such machinery and would be useless without a track on which to run; that the track, therefore, is an essential and ingredient part of the mining machinery.

On the other hand, the state insists that the rails here involved do not come within the exemption provisions of Sec. 755(p), supra, but instead are "railroad rails" which are exempt only when sold by the manufacturers thereof. Code 1940, Tit. 51, Sec. 755(m), as amended, provides for exemption of "railroad rails" as follows:

"(m) The gross proceeds of the sale or sales of railroad rails * * * when sold by the manufacturers * * thereof."

The state makes the further insistence that the rails are building materials and, as such, are subject to the tax; that the tax event was the sale of the rails to the mine operators; that at the time of such sale the rails were not machines or machinery or parts of machines or machinery, but were building materials; that, therefore, they were taxable as such as of the time of the sale; that the tax is not on the use of the rails; and the fact, if it be a fact, that the rails later became a part of exempt machinery would not render them nontaxable.

Sec. 753, Tit. 51, Code 1940, to the extent here pertinent, levies the tax "(a) Upon every person, firm or corporation engaged, or continuing within this state, in business of selling at retail any tangible personal property whatsoever, including merchandise and commodities of every kind and character, * * *."

Sec. 752(j), Tit. 51, Code 1940, as amended, to the extent here pertinent, defines the term "sale at retail" as follows:

"The term 'sale at retail' or 'retail sale' shall mean all sales of tangible personal property except those above defined as wholesale sales. The quantities of goods sold or prices at which sold, are immaterial in determining whether or not a sale is at retail. Sales of building materials to contractors, builders, or landowners for resale or use in the form of real estate are retail sales in whatever quantity sold."

The trial court accepted the company's views and held the rails to be exempt. In so holding, the court made certain findings which are included in the decree. The factual findings are based on testimony taken orally before the court and a stipulation of the parties. The following findings are from the decree:

"The Court finds that it is a common and necessary practice in mining coal to use tram cars to convey the coal from the actual place where it is detached from the earth to the hoisting machines; that the actual place of work in most mines is distance from the entrance to the mine and that the coal must be removed from the working place continuously so that actual mining may continue. The tram cars also carry men to the various rooms or working place continuously, also carry tools, explosives and other things needed in the actual removal of the coal. The mine rails purchased from appellant were laid and used in the underground mines of the said purchasers and the tram cars were operated on them, and without such tracks the tram cars could not operate and the removal of the coal would be so difficult and expensive as to render mining operations impractical, if not impossible.

"The Court finds that the operation of an underground mine is a unitary process; that the mining, loading, hauling, and carrying of the coal out of the mines to the washers, is a continuous operation; that until the coal goes through the washers, it is not suitable for the market and that the use of tram cars and tram tracks is a necessary part of the continuous operation and that without them the average underground mine could not operate.

"The Court further finds that the mine rails are laid more or less loosely and that as working places are extended or changed, the tracks are extended or moved to the new working places.

"It further appears from the testimony that the rails used in the mines are generally of light weight and not suitable for use on railroads transporting heavy cargoes, the rails involved in this case varying from twelve pound rails to sixty pound rails, the great majority being forty-pound and thirty-pound rails.

*     *     *     *     *     *

"That shortly after the passage of said Act (referring to the original Sales Tax Act of 1937), the Honorable L. H. Ellis, who had been Floor leader of the House at the time said Act was passed, rendered an opinion to the State Tax Commission, now the State Department of Revenue, under date of March 27, 1937, which opinion it is stipulated was sent to the Alabama Mining Institute, to which the majority of the coal mining companies in the Birmingham District are members, and that it was circulated among its members. The Court considers this to constitute wide circulation in that it was circulated widely in the industry involved. In that opinion Mr. Ellis specifically held that the machinery of a coal mine included the tram tracks running into the mine. He likewise held that the term 'machinery' included the necessary parts or replacements of worn-out parts, and that such parts and replacements of worn-out parts, and that such parts and replacements are as much machinery as the actual machines themselves. This opinion it clearly appears was not changed or modified prior to the Leg-

islature of 1939, which re-wrote and reenacted the Sales Tax Act and again exempted 'machinery used in mining,' in the same language of the 1937 Act, but extended such definition to include parts, attachments and replacements therefor. It appears to the Court that this was a legislative recognition and approval of the construction in the Ellis opinion. Legislative sessions have been held in 1943, in 1945, in 1947, and in 1949, and the language as written into the 1939 Act immediately following the Ellis opinion has remained the same. The Court is of the opinion that this was a legislative approval and adoption of the departmental construction.

"The Court therefore finds that the rails used by appellant's purchasers in the operation of their underground coal mines was machinery or machines used in mining within the meaning of the Act, * * *.

"The State argues that the rails are railroad rails and that by virtue of the specific exemption of railroad rails when sold by the manufacturer, no other exemption can apply. It appears from the facts that the rails here involved are not suitable for the operation of railroads, being much too lightweight to stand the stress and strain of modern railroad transportation and generally would not be classified as railroad rails."

Our view is that the trial court, under the facts as found, correctly held the rails to be exempt.

It is not disputed, nor do we think it can be questioned, that the rails were "used in mining." The debatable question is whether they were "machinery" used in mining, within the meaning of the Sales Tax Act.

■ We have no statutory definition of "mining," and there is nothing in the Sales Tax Act to indicate an intention to give to it a technical or restricted meaning. It should be construed according to its plain, ordinary signification. It seems clear to us,

as found by the trial court, that it necessarily implies, not only the cutting of the coal from the seam, but its removal to the surface. Webster's New International Dictionary, 2nd Ed., defines "mining" as the "act or business of making or of working mines." It is defined in Ballentine's Law Dictionary, 2nd Ed., p. 819, as "the actual cutting or hewing of the mineral in a mine and its removal to the surface." In 36 Am.Jur., Mines and Minerals, § 3, p. 282, it is said that "the ordinary mining operation consists in sinking shafts to the productive level, digging or blasting out the minerals, and elevating them to the surface for processing or distribution."

■ And it is our view that these rails, under the facts of this case, constituted parts of machinery used in mining. "Machinery" is defined in Webster's New International Dictionary, 2nd Ed., as "the means and appliances by which anything is kept in action or a desired result is obtained; a system of parts adapted to a purpose; * * *." As stated in Shaleen v. Central Coal & Coke Co., 127 Ark. 397, 192 S.W. 225, 227, Ann.Cas.1918E, 198:

"The word 'machinery' is a more comprehensive one than the word 'machine,' and includes appurtenances necessary to the working of a machine. Bouvier's Law Dictionary."

It seems to us that the tracks in these mines constituted essential and ingredient parts of machinery used in mining, and since the rails were used as parts of such tracks that they are not subject to the Sales Tax Act.

■■ Nor do we think that these rails come within the influence of either Sec. 755(m), Tit. 51, as amended, supra, exempting "railroad rails" only when sold by the manufacturers thereof, or of Sects. 752(j) and 753, Tit. 51, as amended, supra, which would make them taxable as building materials.

To follow the state's contention, we would have to hold that all rails, of whatever weight and size, which might be used as a track, regardless of their intend-

ed or actual use, are to be classified as "railroad rails" within the meaning of Section 755(m). We do not think this was intended. The exemption granted by Sec. 755(p) is to machines and machiney used in mining, and the parts of such machines, attachments and replacements therefor "which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used." It is clear from the evidence and the findings of the trial court that these rails were made for the use to which they were put, although they might be usable for other purposes. The provision is not that they be made for the "exclusive" use on or in the operation of such machines, but simply "for" such use. It is likewise clear that they were "necessary" to the operation of such machines and are "customarily so used."

It is to be noted that Sec. 752(j), Tit. 51, as amended, supra, provides, in part, that "sales of building materials to * * * landowners for * * * use in the form of real estate are retail sales", and by virtue of Sec. 753, Tit. 51, supra, are taxable. We pretermit discussion of the question as to whether the rails are "building materials," since it seems clear that they were not sold for "use in the form of real estate." As stated in the decree of the trial court: "The mine rails are laid more or less loosely and that as working places are extended or changed, the tracks are extended or moved to the new working placcs." This is clear recognition that the tracks in this case did not become a part of the realty.

We refer now to that part of the trial court's decree dealing with the administrative interpretation of the Sales Tax Act, as evidenced by the opinion of Honorable L. H. Ellis. This Act first became effective on March 1, 1937. Mr. Ellis, a lawyer of recognized ability, in his capacity as attorney for the State Tax Commission, rendered the opinion referred to in the trial court's decree, supra, on March 27, 1937.

It is an established rule of statutory construction that when a tax statute has been construed by the highest officials charged with the duty of administrating the tax laws, such construction should be given favorable consideration by the courts, especially if such construction has stood unchallenged for a considerable time. State ex rel. Fowler v. Stone, 237 Ala. 78, 185 So. 404; State v. Tuscaloosa Building & Loan Ass'n, 230 Ala. 476, 485, 161 So. 530, 99 A.L.R. 1019. And the weight to be given an administrative interpretation is increased when the legislature, in re-enacting the law, fails to indicate in any way its disapproval of the settled administrative construction. As held in State v. H. M. Hobbie Grocery Co., 225 Ala. 151, 153, 142 So. 46, 47, the re-enactment, without change, of a statute which has been given a uniform construction by the administrative department "may be treated as a legislative approval of the departmental construction of the statute, quite as persuasive as the re-enactment of a statute, which has been judicially construed." These rules are of special significance in this case. There is no evidence of any action being taken by the state toward collecting the tax contrary to Mr. Ellis' opinion until the assessment in 1949. We do not view the memorandum opinion rendered by the Department's attorney in 1941 as affecting or changing the established administrative interpretation made in 1937. There is no indication that the 1941 opinion was acted upon in any way; nor recognized as an administrative construction of the statute. We note that the opinion is headed up with:

"Re: Birmingham Rail & Locomotive Company Sales Tax liability on sales of secondhand railroad rails, etc., to mine operators for use in and about coal mines,"

and concludes with the following:

"It is my opinion that an assessment should be made, and that the doubt, if any, should be determined by the Court, as it is not clear that the rails and attachments thereto would ordinarily be construed as constituting mining machinery within the exemption contained in Section V(r) of the Act."

Despite this expression of doubt in 1941, no action was taken contrary to the 1937 interpretation until the 1949 assessment.

The decree of the trial court is due to be, and is, affirmed.

Affirmed.

All the Justices concur.