80 So.2d 618

## STATE

v.

### G. T. TAYLOR et al.

7 Div. 151.

Supreme Court of Alabama.

Aug. 30, 1954.

Rehearing Denied May 26, 1955.

Si Garrett, Atty. Gen., H. Grady Tiller and Willard W. Livingston, Asst. Attys. Gen., for appellant.

Lusk, Swann & Burns, Gadsden, for appellees.

642

GOODWYN, Justice.

The state prosecutes this appeal from a final decree of the Circuit Court of Etowah County, in Equity, vacating and setting aside a sales tax assessment made by the State Department of Revenue against the appellees, herein referred to as the "Lumber Company".

The questions for decision are whether three classifications of lumber products, sold by the Lumber Company to manufacturers of tangible personal property, are subject to the sales tax. These classifications are described as consisting of "flask material", "individual crating material", and "box car crating material".

The Lumber Company is a lumber manufacturer with its principal place of business in Etowah County, Alabama. The materials here involved were sold by it to the A & J Manufacturing Company, Gadsden, Alabama, the Agricola Furnace Company, Gadsden, Alabama, and the Crescent Stove & Foundry Company, Attalla, Alabama, during the period from October 1, 1944, to September 30, 1949. All three of these companies were engaged in the business of manufacturing stoves and furnaces for sale at wholesale. There appears to be no material conflict in the evidence.

The trial court held all of these materials to be exempt from the sales tax, with which holding we agree.

The provisions of the Sales Tax Act, Code 1940, Tit. 51, Chapter 20, Art. 10, §§ 752–786, as amended, here involved are as follows:

"§ 752. Definitions.—(1) The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning: * * * (i) The term 'wholesale sale' or 'sale at wholesale' means a sale of tangible personal property by wholesalers to licensed retail merchants, jobbers, dealers, or other wholesalers for resale and does not include a sale by wholesalers to users or consumers, not for resale. The term 'wholesale sale' shall include a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters into and becomes an ingredient or component part of the tangible personal property or products which he manufactures or compounds for sale, and the furnished container and label thereof. (j) The term 'sale at retail' or 'retail sale' shall mean all sales of tangible personal property except those above defined as wholesale sales. * * * Sales of building materials to contractors, builders, or landowners for resale or use in the form of real estate are retail sales in whatever quantity sold. Sales of tangible personal property or products to manufacturers, quarry operators, mine operators or compounders, which are used or consumed by them in manufacturing, mining, quarrying or compounding and do not become an ingredient or component part of the tangible personal property manufactured or compounded are retail sales. * * *

"§ 753. Tax levied on gross receipts.—There is hereby levied, in addition to all other taxes of every kind now imposed by law, and shall be collected as herein provided, a privilege or license tax against the person on account of the business activities and in the amount to be determined by the application of rates against gross sales, or gross receipts, as the case may be, as follows:

"(a) Upon every person, firm or corporation engaged, or continuing within this state, in business of selling at retail any tangible personal property whatsoever, including merchandise and commodities of every kind and character, (not including, however, bonds or other evidences of debts or stocks), an amount equal to two percent [now three percent, Gen. Acts 1951, p. 348, effective October 1, 1951] of the gross proceeds of sales of the business ex-

cept where a different amount is expressly provided herein. * * *

* * * * * *

"§ 755. Exemptions.—There are however exempted from the provisions of this article and from the computation of the amount of the tax levied, assessed or payable under this article the following: * * * (p) The gross proceeds of the sale of machines used in mining, quarrying, compounding, processing and manufacturing of tangible personal property; provided that the term 'machines,' as herein used, shall include machinery which is used for mining, quarrying, compounding, processing or manufacturing tangible personal property, and the parts of such machines, attachments and replacements therefor, which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used. * * *"

Section 755 was amended during the assessment period, but not so as to affect the exemption provided by subsection (p). For history of section, see State v. Birmingham Rail & Locomotive Co., 259 Ala. 443, 445, 66 So.2d 884.

Flask Materials

The position taken by the Lumber Company is that these materials are exempt under the provisions of § 755(p), supra; that the flasks are "machines" or "machinery" within the meaning of those terms as used in said section and, therefore, the materials going into the construction of such flasks constitute a part thereof and are likewise exempt. On the other hand, the state contends that flasks are not "machines" or "machinery" within the meaning of § 755 (p); that "there are no moving parts in a 'flask'"; that "the sole and only purpose of a flask is to hold and contain the sand in which the mold is made"; and that "to include a flask of this type within the definition of a machine or machinery would be giving such terms a meaning which is not generally accepted in popular everyday usage". It is further insisted on behalf of the state that the taxable event under the Sales Tax Act was "the sale of the lumber materials by the appellees to the stove manufacturers" and that, therefore, such sales are "subject to the sales tax even though the lumber is used to make a flask and a flask be held to be a machine or machinery."

From the evidence it appears that the process of manufacturing the stoves and furnaces, including the use of flasks in the process, consists substantially of the following: The buying of steel sheets in lengths, cutting the sheets to size, shearing and stamping them into certain shapes and forms, and punching holes in them; making castings in the foundry of various sizes, shapes and widths, and then assembling the stoves and furnaces in salable condition and selling them after they are completed; stoves and furnaces vary in sizes, ranging from about a 100 pound stove to a 2,200 pound furnace; the sizes manufactured vary from time to time according to the customers' orders; foundry pig iron is used in making the castings; in a general way, castings are made in the following manner: Foundry pig iron is purchased in carload lots. It is unloaded and hauled up by elevator to the top of what is called the cupola, which is a melting pot. The pig iron is melted with coke and when it comes out at the bottom of the cupola it is poured into a mold. The mold is made in many different ways. There is what is called machine molding, which takes a crew of five to ten men on a molding machine. That is the large operation. The next operation is what is termed a squeeze mold. That is a small one-man machine. And there is the floor molding. The flask material is used in all three operations. A flask is a part of each operation. The flask is used to hold molding sand so that an impression may be made in the sand with a pattern. The pattern is placed between the two parts of the flask and then the molding sand is tamped down in both parts of the flask, first in one part and then in the other. The wood flask material is grooved or fluted in order to hold the dampened

molding sand in place. The impression having been made, the two parts of the flask are lifted apart, the pattern withdrawn, the two parts replaced together with an opening in the sand for pouring the molten iron into the impression, thus making, when solidified, an exact reproduction of the pattern. In each type operation the sand is squeezed or tamped down tightly against the pattern. It further appears from the evidence that it would be impossible for the companies to carry on their business of making the stove and furnace castings without flasks; that when the lumber material, from which the flasks were made, was ordered, it was specified and designated as flask material, and was ordered on specific thickness and width, though usually in random lengths; that the flutings were usually put in by the Lumber Company and were on the inside of the flasks when made; that the flask material was kept in a separate place, and as flasks were needed they were made in the plant to fit the patterns; that the needs of the business, in its proper operation, required that flasks of various sizes be made from time to time; that one of the companies had as many as 3,000 to 3,500 patterns; that it would be expensive to have already made up flasks to fit every size casting; that some foundries make their own flasks and some buy metal flasks, but most in this territory use wooden flasks and make their own; that it is more practical and economical for a foundry to make its own flasks; that it would be too expensive to use the flask material for any other purpose; that the flask material was ordered invoiced and so kept on the records of the Lumber Company; that it was made of pine lumber; that in the lumber business there are known classified standard sizes and widths of lumber and also sub-standard and extra size pieces; that flask material is not a standard size and is made for the manufacturers according to their specifications and is not manufactured to that size to sell to other customers; that it was made on order and not stocked; and that it was known by the particular name of flask material.

A concise description of a flask is thus given in Webster's New International Dictionary, 2d Ed., p. 962:

"The wooden or iron frame which holds the sand, etc., forming the mold used in a foundry. It consists of two or more parts, viz: the cope, or top; sometimes, the cheeks, or middle part; and the drag, or bottom part."

There is no question about the flasks being used for "manufacturing tangible personal property." The problem is to ascertain whether they are "machines" or "machinery" being so used, as these terms are employed in the exemption statute, § 755(p), Tit. 51, supra. To resolve the point requires that we determine the legislative intent in providing the exemption.

■ While the rule of strict construction against a tax exemption is well established in this state, State v. Wertheimer Bag Co., 253 Ala. 124, 127, 43 So.2d 824; State v. Bridges, 246 Ala. 486, 489, 21 So.2d 316, 159 A.L.R. 678, it is also recognized that such a rule " 'does not impinge upon the all-prevailing rule that a statute is to be construed in accordance with its real intent and meaning, and not so strictly as to defeat the legislative purpose' ", Alabama-Georgia Syrup Co. v. State, 253 Ala. 49, 52, 42 So.2d 796, 798; nor will the court indulge a "strained construction to give effect to this rule where a fair interpretation of the legislative intent may lead to a contrary construction. Arbitrary rules of construction are of little value when the real intent of the legislature can be gathered from the act itself", State v. Calumet & Hecla Consol. Copper Co., 259 Ala. 225, 232, 66 So.2d 726, 730; Holt v. Long, 234 Ala. 369, 371, 174 So. 759.

The terms "machine" and "machinery" are defined by Webster as follows:

"Machine. A contrivance, device, or structure by means of which a force or forces may be advantageously applied, * * *."

"Machinery. The component parts of a complex machine; machines in general. The mechanism of a machine; the working parts; any combination of appliances resulting in successful operation; * * *. Any combination, the harmonious workings of which terminate in a specific object; * * *."

Webster's New Twentieth Century Dictionary, p. 1017.

Ballentine's Law Dictionary, 2d Ed., p. 779, contains the following definitions:

"Machine. The term includes every mechanical device, or combination of mechanical powers and devices, to perform some function and produce a certain effect and result. * * *"

"Machinery. * * * The Century Dictionary defines it as the parts of a machine considered collectively; any combination of mechanical means designed to work together so as to effect a given end; * * *."

In Black's Law Dictionary, 4th Ed., p. 1101, are the following definitions:

"Machine. * * * Device or combination of devices by means of which energy can be utilized for useful operation to be performed. * * *; mechanical device, or combination of mechanical powers and devices, to perform some function and produce a certain effect or result. * * *."

"Machinery. Complex combination of mechanical parts, * * *. A more comprehensive term than 'machine'; including the appurtenances necessary to the working of a machine * * *. Parts of a machine considered collectively; also the combination of mechanical means to a given end. * * *. A part of a machine designed to work with other parts, * * *. Machines in general, or collectively; also, the working parts of a machine, engine or instrument; * * *."

As so aptly stated in City of Louisville v. Howard, 306 Ky. 687, 208 S.W.2d 522, 526:

"The definition of machinery itself is broad enough to cover anything from a peanut-roasting outfit on Main Street to a blast furnace in Pittsburgh."

It seems clear to us that a flask comes within the foregoing definitions of "machine" and "machinery" and is exempt from the sales tax. Being so, the "flask material", used in making the flasks is also exempt. Then, too, there seems no question, aside from their independent qualities as "machines" or "machinery", that flasks are essential in the manufacture of stoves and furnaces by these companies and, therefore, constitute integral and indispensable parts of the over-all manufacturing machinery used by them. They are also exempt for this reason.

The exemption granted by § 755 (p), Tit. 51, supra, to the extent here pertinent, is to machines or machinery "used for * * * manufacturing tangible personal property, and the parts of such machines, attachments and replacements therefor, *which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used.*" We are satisfied from the evidence that the materials under this classification were manufactured by the Lumber Company for use by the stove and furnace manufacturers in making flasks, although such materials might be usable for other purposes. "The provision is not that they be made for the 'exclusive' use on or in the operation of such machines, but simply 'for' such use." State v. Birmingham Rail & Locomotive Co., 259 Ala. 443, 448, 66 So.2d 884, 889, supra. It is also clear that the materials were "necessary to the operation of such machines and are customarily so used".

Although the tax exemption statute under consideration in Gulf Oil Corp. v. Philadelphia, 357 Pa. 101, 53 A.2d 250, 251, 252, 253, 172 A.L.R. 302, was not the same as the one now before us, we think the discussion

of the point for decision there made is appropriate here. The statute there under consideration provided that "in cities of the first class, the assessment of real estate for taxation, the machinery and tools used in manufacturing in any mill or manufactory shall not be considered or included in determining the value of real estate * * *." 53 P.S. § 4742. The question was whether certain tanks constituted "machinery". The trial court held that they were not, giving as a reason that the tanks " 'are not intended to apply force or involve the quality of motion; they are static and have the same characteristics as the walls of a mill or of a silo.' " The Supreme Court of Pennsylvania held otherwise, saying:

> " * * * The fallacy that tanks or containers in which processing takes place cannot be either machines or machinery proceeds from the erroneous premise that nothing is machinery that does not 'apply (physical) force or involve the quality of motion.' Before and at the very dawning of the 'machine age' when the machinery best known to the public were saw mills and grist mills and later cotton gins and steam engines, it was natural to entertain the concept that all machinery involved motion and anything which did not move was not machinery. The modern 'machine age' has outgrown that concept. Much of the machinery today has only passive or motion-less functions to perform in manufacturing."

■ The position taken by the state that the "taxable event" was "the sale of the lumber materials" by the Lumber Company to the manufacturers is fully answered, we think, by the decision in State v. Birmingham Rail & Locomotive Co., 259 Ala. 443, 445, 448, 66 So.2d 884, 886, supra. As there said:

> "The state makes the further insistence that the rails are building materials and, as such, are subject to the tax; that the tax event was the sale of the rails to the mine operators; that

at the time of such sale the rails were not machines or machinery or parts of machines or machinery, but were building materials; that, therefore, they were taxable as such as of the time of the sale; that the tax is not on the use of the rails; and the fact, if it be a fact, that the rails later became a part of exempt machinery would not render them nontaxable.

> *   *   *   *   *   *

> "It is to be noted that Sec. 752(j), Tit. 51, as amended, supra, provides, in part, that 'sales of building materials to * * * landowners for * * * use in the form of real estate are retail sales', and by virtue of Sec. 753, Tit. 51, supra, are taxable. We pretermit discussion of the question as to whether the rails are 'building materials,' since it seems clear that they were not sold for 'use in the form of real estate.' "

## Individual Crating Material

■ It is more or less conceded that Odum Lumber Co. v. Southern States Iron Roofing Co., 36 Ala.App. 270, 58 So.2d 641, 643, certiorari denied 257 Ala. 258, 58 So.2d 644, has decided the question with respect to "individual crating material". As there stated:

> "It is appellant's contention that under the terms of Section 752(i) the term 'furnished container' means a completed container, and does not extend to the materials used in constructing a container.

> "The basic philosophy underlying our Sales and Use Tax Acts, Code 1940, Tit. 51, §§ 718 et seq., 744 et seq., is that such taxes are to be levied on retail sales, where the payment is made by the ultimate consumer. Due recognition of this principle would in itself deny appellant's contention, for it is clear under the stipulated facts that the containers made from the lumber were used in shipping the manufactured product and went with it. The contain-

er could not therefore be said to be a retail sale.

\* \* \* \* \* \*

"If the interpretation contended for by the appellant were adopted, the result would be that if a manufacturer purchased finished containers for his product, such finished containers would not be subject to the sales tax. If on the other hand sound business practice and economics would direct that he purchase the materials and make the containers himself, he would be subject to the sales tax on the materials out of which the containers were made. This in effect would be a tax on the container.

"We do not think that it was the intent of the legislature to thus penalize good stewardship in business management."

The Odum case was referred to and relied on by this court in State v. Calumet & Hecla Consol. Copper Co., supra, in holding that staples, nails and other materials used by the taxpayer in making the finished container for the products which it manufactured for sale were exempt from the use tax. Although the Calumet & Hecla case involved a question of use tax, and the case now before us involves the sales tax, the principles involved in the two cases are identical.

### Box Car Crating Material

■ Determining whether this classification of materials is taxable or exempt presents a problem more difficult of solution than the others. However, it is our view that the evidence sufficiently establishes these materials as having entered into and become an ingredient or component part of "furnished containers", within the meaning of that term as used in § 752(1) (i), Tit. 51, supra, in defining "wholesale sale". It is to be noted that the definition of "wholesale sale", as included in § 752(1) (i), contains the following:

"The term 'wholesale sale' shall include a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters into and becomes an ingredient or component part of the tangible personal property or products. which he manufactures or compounds for sale, and the furnished container and label thereof."

The insistence on behalf of the state is that "box car crating material" is "bracing material", and, as such, cannot be said to be property "which enters into and becomes an ingredient or component part of . * * the furnished container"; that "furnished container, as used in § 752(1) (i), supra, could mean only what the word imports in its ordinary meaning—a box, wrapping, or crate in which a product is packed · for shipment"; that it "was not the intent of the legislature" to exempt materials as here used by the manufacturers in shipping their manufactured products.

The position taken by the Lumber Company is thus stated in its brief:

"There were two types of crating or enclosures under which the manufacturer shipped the products. One was to crate each individual stove in a separate and individual crate. The other was to partially crate a small stove and, as partially crated, these stoves would be lined up in the box car and thereupon a collective crate, composed of the crating material and the lumber purchased exclusively on order for that purpose, and kept entirely separate, would then be built around these stoves and they would thus be collectively crated. The purpose of this crating was identical with that of the individual crating and was done. for the purpose of securely packaging the product for shipment to the purchaser. It was not included as a separate element of cost but was included in the total cost of the articles so shipped. * * * [T]his container material or closure material, as it is called, should be no more subject to the tax than would be the crating material used in making an individual .

' crate. The purpose, use, object, the whole situation is identical. * * * That it was the legislature's intent to relieve manufacturers of the cost of the enclosure of manufactured products shipped to the purchaser. That the construction of the clause in accordance with the state's contention would give it an impracticable effect. That is, one manufacturer would individually crate his products, another would crate them collectively. The one who crated them individually would not pay the tax while the one who crated them collectively would be subject to the tax. That is neither rational, sensible, nor liberal in view of the relief which the legislature evidently intended to give to the manufacturer."

We make it clear that we are not here dealing with material used simply for bracing, that is, to keep the stoves and furnaces in place and from shifting about in the box cars. It is shown by the evidence that such bracing material is used whether the stoves and furnaces are individually crated or collectively crated.

■ In the final analysis, for us to hold with the state we must say, in effect, that the legislature intended to include within the term "furnished container" an individual container only, that is, a container furnished for and accompanying each separate article intended for sale at retail and normally remaining with such article until the article is sold to the ultimate consumer at retail. A very strict construction might lend support to such a holding. However, we think "a fair interpretation of the legislative intent" leads to a different construction. We hold that the so-called "collective" crating, under the facts of this case, comes within the meaning of "furnished container" as that term is used in the definition of "wholesale sale" in § 752 (1) (i), Tit. 51, supra. Is not the use of a "collective" container, as here involved, analogous to use by a watch manufacturer, for instance, of a large box or carton for shipping a number of individually packaged watches? Could it be said that the legislature intended to exempt the boxes containing the individual watches and, at the same time, to tax the larger container? Are not both "furnished containers" of the property or products manufactured? To hold that one is exempt and the other taxable would, indeed, be placing a strained and unnatural construction on the statute. As we interpret the statute, it provides that a "furnished container" of tangible personal property or products manufactured for sale is a "wholesale sale". We perceive no basis for saying that this means only containers which normally remain with each separate article until sold at retail, but means, instead, just what it says, "the furnished container" of the "property or products" manufactured. A non-returnable container furnished by the manufacturer in shipping his products to a wholesaler or retailer is nonetheless a furnished container whether it contains one article or several articles in separate containers. As stated in Alabama-Georgia Syrup Co. v. State, 253 Ala. 49, 53, 42 So. 2d 796, 800:

"Nor does the statute say that when there is more than one container of the product, only the inner container is to be excluded from the tax."

The fact that the containers are built around the stoves and furnaces in the box car does not destroy their characteristics as "furnished containers". The time, place and manner of packaging is not a determining factor. It is the furnishing by the manufacturer of a container for his manufactured property or products which is the basis for exemption.

It follows, from what we have said, that the decree appealed from is due to be affirmed. It is so ordered.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and CLAYTON, JJ., concur.

## On Rehearing.

Counsel for the State seem concerned that the decision in this case is in conflict

with the holdings in Layne Central Co. v. Curry, 243 Ala. 165, 8 So.2d 839, and State v. Wilputte Coke Oven Corp., 251 Ala. 271, 37 So.2d 197. In those two cases the materials involved were for use in the form of real estate while in the instant case none of the materials was for such use. Hence, those cases have no application to the purchase of materials for use on or in the operation of exempt machines and which are necessary to the operation of such machines and are customarily so used.

Application for rehearing is denied.

LIVINGSTON, C. J., and SIMPSON and MAYFIELD, JJ., concur.