83 So.2d 425

### STATE

### v.

### MINE & CONTRACTORS SUPPLY COMPANY, Inc.

### 6 Div. 864.

Supreme Court of Alabama.

Nov. 10, 1955.

John Patterson, Atty. Gen., and Willard W. Livingston, Jas. R. Payne and Wm. H. Burton, Asst. Attys. Gen., for appellant.

Cabaniss & Johnston, Lucien D. Gardner, Jr., and E. T. Brown, Jr., White, Bradley, Arant, All & Rose and John J. Coleman, Jr., Birmingham, amici curiae.

LAWSON, Justice.

This is an appeal by the State from a decree of the Circuit Court of Jefferson County, in Equity, partially overruling an assessment made by the State Department of Revenue against the appellee, Mine & Contractors Supply Company, Inc., a corporation, for sales taxes claimed to be due by appellee as a result of the sale of four separate articles of tangible personal property.

The trial court held that the taxes were not due on the sale of the four articles because of the provisions of § 755(p), Title 51, Code 1940, as amended, which reads:

"§ 755. Exemptions.—There are however exempted from the provisions of this article and from the computation of the amount of the tax levied, assessed or payable under this article the following:

Wm. S. Pritchard and Winston B. McCall, Birmingham, Chas. R. Wiggins, Jasper, Pritchard, McCall & Jones, Birmingham, and Wiggins & Wiggins, Jasper, for appellee.

"* * * (p) The gross proceeds of the sale of machines used in mining, quarrying, compounding, processing and manufacturing of tangible personal property; provided that the term 'machines,' as herein used, shall include machinery which is used for mining, quarrying, compounding, processing or manufacturing tangible personal property, and the parts of such machines, attachments and replacements therefor, which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used."

One of the articles the sale of which the State insists is taxable is a very large piece of machinery referred to by the appellee and the company which purchased it as a Manitowoc dragline. It weighs

more than 300,000 pounds and has a boom 100 feet in length which can be raised to a height of 65 feet. A large "bucket" weighing as much as 13,000 pounds is attached by cables to the end of the boom.

The dragline was sold by appellee to a concern which is engaged only in the mining of coal and the piece of machinery has never been used for any purpose other than in connection with the purchaser's strip mining operations.

The State concedes that the term "mining" as used in § 755(p), Title 51, supra, is a broad term and may apply to various methods of extracting a mineral product from beneath the soil and does apply to the method sometimes referred to as "strip mining," which is a process whereby the soil and rocks overlying a mineral deposit are removed and the mineral (coal in this instance) is then mined directly from the seam thereby exposed.

Without dispute the dragline was used to remove the soil and rock lying over the coal which the purchaser mined. On several occasions during the course of the trial below, counsel appear to have been on the verge of asking questions calling for answers which no doubt would have shown the exact manner in which the dragline performed its function, but such questions were never asked. Apparently those questions were considered unnecessary because the State conceded that strip mining was a part of the mining process and because of the trial judge's apparent familiarity with the part which the dragline plays in strip mining. However, we think we are justified in saying here, after an examination of the picture of the dragline which was introduced in evidence and the statements in briefs of all parties, that the dragline accomplished its mission in this manner: The bucket which is attached by cables to the end of the boom is pulled or dragged by the cables towards the machine. In this manner the bucket becomes filled with the soil and rock referred to as the overburden. After the bucket is emptied, the process is repeated until the overburden is removed. After the removal of the overburden the coal may be mined in the same way.

Unquestionably the dragline is a machine used in mining. But the State contends that the dragline is an automotive vehicle and argues that under our holding in Burford-Toothaker Tractor Co. v. Curry, 241 Ala. 350, 2 So.2d 420, 421, its sale was subject to taxation.

We do not consider the question as to whether the opinion in the Burford-Toothaker case, supra, is authority for the proposition that the sale of an automotive vehicle is in all instances subject to the sales tax irrespective of the fact that it is admittedly used "for mining, quarrying, compounding, processing or manufacturing tangible personal property," nor do we express an opinion as to the soundness of such a conclusion if that is the holding.

■ There is no reason for us to consider those questions, for we are convinced beyond peradventure that the dragline here involved is not an automotive vehicle. True, it is capable of moving forward under its own power at the alarming rate of speed of nine-tenths of a mile per hour. It has been taken across the highway which runs through the lands owned by the mine operator after a permit has been secured from the State Highway Department and under the supervision of members of the Alabama State Highway Patrol. In order for the dragline to be taken across the highway it was necessary to cover the highway with approximately eight inches of dirt and coal.

In order to maintain its position, the State argues here with considerable emphasis that actually the piece of machinery presently involved is basically a tractor and that the boom and dragline equipment are merely attachments which can be removed from the tractor with considerable ease.

The evidence does show that the machinery here involved was shipped by railroad to a point near the coal lands of the purchaser situated in Walker County. After removal from the railroad cars it was assembled and then moved to the "stripping pits." Later it was dismantled and moved

to a strip mining operation in Tuscaloosa County. Aside from the fact that it can only move at a rate of speed less than one mile per hour, its size and weight make it mandatory that it be dismantled in order for it to be moved any distance. But the fact that it can be dismantled and when dismantled one of its parts is alone capable of self-propulsion does not justify a holding that basically that which we have referred to as the dragline is merely a tractor with a few interchangeable parts. In fact, we have read the record with care and we can find no evidence which justifies the conclusion that the removal of the boom from the base is a small operation.

The argument of the State that the dragline is a " 'means of conveyance' " and hence a vehicle as defined in the Burford-Toothaker case, supra, is so far-fetched as perhaps it should not even be mentioned. The argument is that the bucket at the end of the cables carries the overburden a few feet before the bucket is emptied. We do not care to make any further comment on this assertion.

In the course of the trial below, in answer to a question propounded by the court, counsel for the State indicated that the State took the position that the only machines the sale of which are exempt from taxation by virtue of the provisions of § 755(p), Title 51, supra, are those machines which are manufactured to be used exclusively for "mining, quarrying, compounding, processing or manufacturing tangible personal property". While the briefs filed here on behalf of the State call attention to the fact that by the removal of certain attachments and the addition of others the machine thus created may be capable of performing other functions, we do not understand the State to assert here the position which it took in the trial below. In any event, the State unsuccessfully took that position in the recent case of State v. Birmingham Rail & Locomotive Co., 259 Ala. 443, 66 So. 2d 884.

We have considered the case with considerable care and are clear to the conclusion that the evidence does not justify a finding that the piece of machinery presently under consideration is an automotive vehicle. We are in accord with the conclusion reached by the trial court from the evidence taken orally before it that the sale of the dragline was not subject to taxation because of the provisions of § 755(p), Title 51, supra.

■ Two of the articles the sale of which the trial court held not to be taxable are crawler type cranes, which it found from the evidence were used in the manufacturing or processing of tangible personal property. The evidence fully supports the finding that the cranes were actually used in the production line for manufacturing purposes (State v. Calumet & Hecla Consolidated Copper Co., 259 Ala. 225, 66 So.2d 726) and were not used merely to transport finished products, as was the situation in Alabama-Georgia Syrup Co. v. State, 253 Ala. 49, 42 So.2d 796.

But because the cranes were attached to "crawlers" whereby they could be moved from place to place on the job, if necessary, the State contends they are automotive vehicles and hence their sale subject to taxation. What we have said in regard to the dragline is dispositive of this insistence.

■ The other article here involved is called a "prospector drill," which the evidence shows was used "to drill down through the ground to find out whether this Asphaltic Limestone is underneath it so that they know where to mine." As to its use in mining, one of the witnesses on cross-examination by the State said, "Well, I tell you it is rather silly to go out to do that mining, that strip mining, unless you do use one of these drills." Our holding in State v. Birmingham Rail & Locomotive Co., 259 Ala. 443, 66 So.2d 884, fully supports the trial court's conclusion that the sale of the prospector drill was exempt from taxation by virtue of the provisions of § 755(p), Title 51, supra.

■ Costs in the trial court were taxed against the appellee here. That action of

the trial court the appellee challenges by cross-assignment of error. While the appellee was successful in its contention in regard to the four articles with which we have dealt on this appeal, the record shows that the appeal taken by the appellee from the action of the State Department of Revenue to the circuit court, in equity, involved a large number of other items, the sale of which during the course of the proceedings in the court below the appellee agreed was taxable.

The taxation of costs in equity proceedings is governed by Equity Rule 112, Code 1940, Title 7, Appendix, which in pertinent part is as follows:

"Costs will be imposed by the court or judge having jurisdiction at such times during the litigation as he deems proper, subject to correction for improper exercise of his discretion, and may be apportioned by him between the parties; * * *."

In Thompson v. Bryant, 251 Ala. 566, 38 So.2d 590, 593, we said: "In equity the matter of costs rests largely in the discretion of the chancellor."

And in Dozier v. Payne, 244 Ala. 476, 14 So.2d 376, 377, it was said of Equity Rule 112, supra:

"* * * An 'improper' exercise of discretion appears when the record, after indulging all fair intendments in favor of the ruling, discloses the taxation of costs was unjust and unfair. Otherwise the action of the trial court should not be disturbed."

We are unwilling to say that the action of the trial court in taxing the costs against the appellee constituted an improper exercise of discretion.

The decree is due to be affirmed. It is so ordered.

Affirmed.

LIVINGSTON, C. J., and STAKELY and MERRILL, JJ., concur.