206 So.2d 354

**STATE of Alabama**

**v.**

**CALUMET & HECLA, INC., ALAMET DIVISION.**

**2 Div. 495.**

Supreme Court of Alabama.

Jan. 11, 1968.

MacDonald Gallion, Atty. Gen., Willard W. Livingston and Wm. H. Burton, Asst. Attys. Gen., for appellant.

**550**

Reeves & Stewart, Selma, for appellee.

HARWOOD, Justice.

This is an appeal by the state from a decree holding that paper bags used in the course of manufacturing magnesium were subject to a use tax of 1½% rather than 3% as assessed by the Revenue Department, the lower court taking the view that the bags as used were "machines" in the processing and manufacture of the magnesium.

Calumet and Hecla, the appellee here, is engaged in the production of primary magnesium metal in the form of ingots and pigs. The magnesium is manufactured by what is termed the thermal reduction process, a highly specialized field of metallurgy, and appellee's plant in Dallas County is the only one in this country using this process.

The raw material used in the process is dolomite, mined by the company at Briarfield, Alabama.

The dolomite is first placed in a rotary kiln and "calcined" and this calcine thus produced is then ground into powder, and mixed with ferrosilicon and fluorspar. This powdered mixture is made into briquettes under pressure.

These briquettes are quite friable, or breakable, and if exposed to air for any substantial length of time, are subject to rehydration.

From the briquette press, and while yet warm, the briquettes go to the bagging station where they are placed in seventy pound Kraft paper bags, approximately 50 pounds of briquettes in each bag.

The briquette filled bags are then transported on what is called briquette buggies to the furnace retorts.

These retorts, of which there are 248, are in the shape of a tube some 12 feet long and 11½ inches in diameter. They are heated to temperatures of 2100° Fahrenheit.

Seven bags of briquettes are manually shoved in a retort, one at a time, by means of a specially designed rake. After the bags of briquettes are pushed into the retort, the tube is closed, and the briquettes are heated for 7½ hours.

During this time, the briquetted material releases magnesium vapors which are condensed in the cold section of the retort and in this manner a slug of magnesium called a crown is produced. These crowns are removed from the retorts, and go through two processes of melting and refining be-

fore being cast into ingots or pigs or other desired shapes.

The briquetted material is removed from the retort and discarded as waste.

In the hearing below two employee witnesses testified for the company, one being an expert metallurgist. The state also presented a witness who was an expert in the field of metallurgy. Numerous exhibits illustrating the manufacturing process, and a paper bag used therein, were received in evidence.

Actually there appears little contradiction between the testimony of the witnesses, though the expert witness for the state was of the opinion that the paper bags' main characteristic in the manufacturing process was that of a container of the briquettes as they were placed in the retainer, though "not the only function." He further testified that the bags helped shape the charge of briquettes in the retorts, and to a degree performed other functions as testified to by the company's expert witness.

After the hearing, the court made the following finding of facts:

"That the paper bags as used by Appellant in its manufacturing process help shape the geometry of the briquette pile inside the furnace retort; that the paper bags as used by Appellant in its manufacturing process prevent rehydration of the briquetted material; that the paper bags tend to prevent over-charging of the furnace retort by maintaining the briquettes in the desired shape; and

"That the paper bags as used by Appellant perform an important function in the thermal reduction process by leaving an unobstructed pathway for the magnesium vapours to move to the cold end of the furnace retort; and

"That the paper bags burn, and are consumed in the process after being shoved into the retorts, but the paper bags help to protect the silicon reducing agent from oxidation while the retorts are open due to the creation of a reducing atmosphere;

"That research has failed to develop any substitute which will perform the function of the paper bags in the thermal reduction manufacturing process as economically, as effectively or as efficiently as do the paper bags; and

"The Court is of the opinion from all of the evidence in the case and does so find as follows:

"That the paper bags as used by Appellant perform an integral function in the manufacture and processing of the magnesium, pig or ingots; and that the paper bags as used by Appellant have a direct part in the manufacture and processing of its tangible personal property; and

"That the paper bags as used by Appellant in the manufacture and processing of the magnesium, pig or ingots, are machines used for the compounding, processing or manufacturing of tangible personal property; and

"That as such machines the said paper bags purchased by Appellant were taxable at the rate of $1\frac{1}{2}\%$ pursuant to the provisions of Title 51, Sec. 788(b) of the Code of Alabama of 1940, as amended, rather than at the rate of $3\%$ and * * *."

The court then decreed that the assessment of $3\%$ was erroneous and void to the extent that it assessed the use tax above $1\frac{1}{2}\%$, and that the appellee was entitled to a refund of $1417.43 with interest from 3 August 1964, the date on which appellee paid the assessment, and noted its appeal therefrom.

In addition to the facts above found by the court, we wish to note that Mr. Peter Gibbs, Technical Manager of appellee's plant, testified that the paper bags used in the operation "are not just shelf item bags. These are made especially for Alamet, to do the job they have to do." One of the

bags was received in evidence as an exhibit. It bears the legend: "100% Kraft—15 by 29 ¾—5—70 pounds—Special Sack." Mr. Gibbs further testified that the bags were stamped "Special Sack" because they were ordered according to specifications by appellee for its use.

It was further shown that the appellee uses 2,000,000 of these bags annually at a cost of approximately $40,000.00.

 We have carefully studied the record presented on this appeal, and we are clear to the conclusion that the findings made by the lower court are amply supported by the evidence and pleadings.

The statute involved in this review is Sec. 788(b) of Title 51, Code of Alabama 1940. In parts pertinent to this review, the statute reads:

"An excise tax is hereby imposed on the storage, use, or other consumption in this state of any machines used in * * compounding, processing and manufacturing of tangible personal property, purchased at retail on or after October 1, 1965, at the rate of one and one half percent of the sales price of such machine; provided, that the term 'machine' as herein used, shall include machinery which is used for * * * compounding, processing, or manufacturing tangible personal property, and the parts of such machines, attachments, and replacements therefor, which are made or manufactured for use on or in the operation of such machines and are customarily so used."

Prior to Act No. 99, effective 1 October 1959, approved 18 August 1959 (1959 Acts of Alabama, page 295), Sec. 788(b) had appeared as subsection (p) of Sec. 789, Code of Alabama 1940, which section set forth exemptions to the use tax. See State v. Four States Drilling Co., 278 Ala. 273, 177 So.2d 828. Thus the character of use tax on machines was changed after 1 October 1959, from that of an exemption, to be construed strictly and doubts resolved in favor of the taxing authority, to a levy of a tax, to be construed in favor of the taxpayer, if of doubtful application.

In State v. Taylor, 262 Ala. 639, 80 So. 2d 618, this court held that lumber made on order according to specifications and which was to be used in making flasks for the casting of iron stove legs, was exempt from use taxes as a "machine," the flasks being essential in the manufacture of stoves, constituted an integral and indispensable part of the overall manufacturing machinery. This conclusion was reached at a time when the statute now being considered created an exemption with doubtful meaning to be construed in favor of the taxing authority.

In State v. Newbury Manufacturing Co., 265 Ala. 600, 93 So.2d 400, the appeal was by the state from a decree holding that "sand" and "steel shot" were exempt from the use tax as being parts of a machine used in manufacturing tangible personal property, i.e., cast iron fittings.

The "sand" was of a special type, purchased in Arkansas, and was used primarily in making cores necessary in the taxpayer's operation. The "steel shot" were used in cleaning the cast iron fittings after they were made.

In affirming the decree of the lower court, this court wrote:

"The term 'machines, attachments and replacements' in this connection have been given a broad meaning. State v. Wilputte Coke Oven Corp., 251 Ala. 271, 37 So.2d 197; State v. Alabama Gas Corp., 258 Ala. 356, 62 So.2d 454; State v. Calumet & Hecla Consol. Copper Co., 259 Ala. 225, 66 So.2d 726; State v. Taylor, 262 Ala. 639, 80 So.2d 618. Their status is not controlled by the material of which they are composed, but by the office they serve in the process. If the article in question performs an integral function in the procedure by which the tangible personal property is produced, we think it is a part and par-

cel of the machinery used in its production. It is not controlled by the fact that in its use it wears out its valuable properties in that connection. Many parts of machinery wear out and have to be replaced.

"On the other hand, if a product, such as grease or fuel is useful only as an aid, though vital in enabling the machine or some part if it to operate, but not itself performing a distinct function in the operation, it does not come within the exception.

"The 'sand' and 'steel shot' here in question have an independent function in the operation. That is not simply as an aid to some other part in the performance of its service. The question is not controlled by whether it is necessary to the operation of a machine—grease and fuel are that, but they perform no specific function in the operation. It is sometimes said to depend upon whether the article has a *direct* part in the processing program. Tri-State Asphalt Co. [Corp.] v. Glander, 152 Ohio St. 497, 90 N.E.2d 366; Anderson & Sons v. Glander, 154 Ohio St. 561, 97 N.E.2d 29."

In the fairly recent case of State v. Four States Drilling Co., 278 Ala. 273, 177 So.2d 828, this court, in affirming the lower court, held that the casing, tubing, and other equipment used in forcing power oil and demulsifier to the bottom of an oil well in order to make the production oil flow more easily, and also to start a process which made the production oil into a marketable oil, such items, i. e., the casing and tubing used in the operation of the well, was machinery used in processing tangible personal property.

We consider the present case within the influence of the three above mentioned cases.

Under the evidence, the lower court was fully justfied in finding that the paper bags were an integral, essential, and functional part of the machinery and procedure by which the magnesium metal (tangible personal property) was produced.

The bags were not, as contended by the state, mere containers for transportation of the briquettes to the retorts, but on the other hand were a constituent part of the procedure in processing the dolomite into the finished magnesium metal. Alabama-Georgia Syrup Co. v. State, 253 Ala. 49, 42 So.2d 796, holding that platform trucks, used in transporting material from one point in the plant to another and during which no processing procedure occurred, therefore is not applicable.

Affirmed.

SIMPSON, MERRILL and COLEMAN, JJ., concur.