Exxon Mobil Corporation ("Exxon") petitioned this Court for a writ of certiorari seeking review of the judgment of the Court of Civil Appeals affirming, without an opinion, the judgment of the Baldwin Circuit Court upholding a final assessment against Exxon by Baldwin County of a use tax. Exxon Mobil Corp. v. BaldwinCounty (No. 2030648, Dec. 30, 2004), 921 So.2d 478 (Ala.Civ.App. 2004) (table). We granted the petition to review an issue of first impression concerning the interpretation of § 40-20-2(c) and (d), Ala. Code 1975, imposing limitations on the power of a county to impose taxes on businesses such as Exxon. We reverse and remand.
Exxon produces natural gas from offshore wells located in Mobile Bay and in the Gulf of Mexico. To accomplish that purpose, Exxon established offshore drilling and production facilities. Some time before 1993, Exxon contracted with McDermott, Inc., a Louisiana company, to construct at McDermott's plant in Morgan City, Louisiana, "platforms" and "templates" that compose the basic structures of *Page 305 
offshore drilling and production facilities. The record contains the testimony of a design engineer for Exxon, who explained the nature and function of "platforms" and "templates":
 "[A platform] is the main facility that gathers, treats, and processes natural gas from the wells out there. . . . [The templates] are structures adjacent or outlying to the main production platform that gathers [sic] natural gas before it is transported to the main hub . . . [A] platform has many more facilities on it . . . [;] the template serves only really one purpose, and that's to gather the gas coming out of a well, or multiple wells, and then it cools the gas down, because it is very hot. And then it just transports those fluids across the bridge structure to the main platform, where that gas — water is removed from it, and it's dehydrated. It's treated so that some of the contaminants are removed so that it doesn't corrode the pipelines on the way to the plant."
After they were manufactured, the platforms and templates were transported by water to their intended offshore locations, being either towed or carried on a barge. One of these platforms and its associated templates were eventually located on submerged lands within the taxing jurisdiction of Baldwin County.
Although not entirely clear from the record, it would appear that Exxon itself purchased all of the materials, supplies, and equipment used to manufacture the platforms and templates, and, although again not entirely clear from the record, it apparently did so in Louisiana. Baldwin County notes in its brief, without any real explanation, that Exxon had obtained a "direct pay permit," which allowed it to purchase the materials, supplies, and equipment without paying a sales tax in Louisiana. A letter in the record dated November 16, 1995, from an employee in the "foreign audit section" of the Alabama Department of Revenue to another employee, advises that "Exxon received a direct pay permit RA 000 RA 322 for the construction of Onshore treating facility and Offshore production platforms in state waters."
In his testimony, the Exxon design engineer explained that once platforms and templates have been transported to the desired location over the gas well or wells to be serviced, the structures are placed on submerged caissons or foundations. The facility is then hooked up to pipelines to the processing plant and production commences. The interval between that setup and the production of natural gas can be as short as a couple of weeks or as long as several months. No witness testified concerning the time frame involved for the offshore drilling and production facility located in the submerged waters off the coast of Baldwin County. The portions of § 40-20-2, Ala. Code 1975, pertinent to an understanding of the issues in this case are as follows:
 "(a)(1) There is hereby levied, to be collected hereafter, as herein provided, annual privilege taxes upon every person engaging or continuing to engage within the State of Alabama in the business of producing or severing oil or gas, as defined herein, from the soil or the waters, or from beneath the soil or the waters, of the state for sale, transport, storage, profit or for use. The amount of such tax shall be measured at the rate of eight percent of the gross value of said oil or gas at the point of production except as provided in subsequent subdivisions of this subsection.
". . . .
 "(b) The tax is hereby levied upon the basis of the entire production in this state, including what is known as the *Page 306 
royalty interest, on which production the amount of such tax shall be a lien, regardless of the place of sale or to whom sold, or by whom used, or the fact that the delivery may be made to points outside the state; and the tax shall accrue at the time such oil or gas is severed from the soil or the waters, or from beneath the soil or the waters, and in its natural, unrefined or unmanufactured condition. . . .
 "(c) A county, city, town or municipality of the State of Alabama shall not establish, levy, impose or collect, as a condition of doing business or otherwise, any tax, fee, license or charge whatsoever, directly or indirectly, on or with respect to the production, treating, processing, ownership, sale, storage, purchase, marketing or transportation on any oil or gas produced in the State of Alabama and on which severance taxes have been paid to the State of Alabama, or upon the business of producing, treating, processing, owning, selling, buying, storing, marketing or transporting such oil or gas, or upon the ownership, operation or maintenance of plants, facilities, machinery, pipelines, gathering lines or any equipment whatsoever, which are, or may be, necessary or convenient to the production, treating, processing, ownership, storage, sale, purchase, marketing or transportation of such oil or gas; provided, that nothing herein shall be construed to prohibit, limit or restrict a county, city, town or municipality from imposing and collecting ad valorem taxes on any property, real or personal, not otherwise now exempted by law; further, the limitation herein imposed upon counties, cities, towns and municipalities shall not apply to any county, city, town or municipality which does not receive a share of the severance tax levied upon production other than off-shore production as defined in Section 40-20-1 under the provisions of this article. Said limitation herein imposed upon counties, cities, towns and municipalities shall remain in full force and effect in regard to offshore production as defined in Section 40-20-1.
 "(d) Nothing contained herein shall be deemed to limit or to enlarge the authority of a county, city, town or municipality to levy taxes or licenses on oil refining facilities located therein or on the suppliers of services or goods not including oil or gas to those persons engaging in the business of producing, treating, processing, owning, selling, buying, storing, marketing or transporting such oil or gas. Provided, however, no such taxes or licenses shall be levied on offshore drilling or production facilities as defined in Section 40-20-1."
Consistent with the terminology used by the parties, § 40-20-2 is hereinafter sometimes referred to as "the severance tax statute," and the tax imposed by it as "the severance tax."
Section 40-23-61(a) imposes an excise tax, also known and hereinafter referred to as a "use tax," which, relevant to the instant action, is imposed upon "the storage, use or other consumption in this state of tangible personal property . . . purchased at retail . . . for storage, use or other consumption in this state at the rate of four percent of the sales price of such property or the amount of tax collected by the seller, whichever is greater. . . ."
By adopting two virtually identical and overlapping ordinances, Baldwin County has established its own use tax. The ordinances contain the following language: "An excise tax is hereby imposed on the storage, use, or other consumption in Baldwin County of tangible personal property . . . purchased at retail . . . for storage, *Page 307 
use or other consumption in Baldwin County. . . ."
It is undisputed that Exxon paid the State the use taxes associated with the offshore drilling and production facility located within Baldwin County (hereinafter "the Baldwin offshore facility"), that it has paid all ad valorem taxes due with respect to the facility, and that it has paid the State substantial severance taxes due under § 40-20-2(a)(1) for the production of natural gas from the Baldwin offshore facility. Pursuant to § 40-20-8, prescribing the allocation and distribution of oil and gas severance taxes among the State, counties, and municipalities, Baldwin County has received 10 percent of all severance taxes paid by Exxon to the State based on the production of natural gas from the Baldwin offshore facility. Additionally, by virtue of a statute enacted on October 1, 1971, for the sole benefit of Baldwin County, it receives an additional 1% severance tax on oil and gas removed from its soil or waters or from beneath its soil or waters. Act No. 2120, Ala. Acts 1971.
At various times, Baldwin County has directly handled the assessment and collection of its use taxes, has arranged for the Alabama Department of Revenue to do so, or has outsourced the work to an independent contractor. On February 27, 1996, after Baldwin County had elected to change its collecting agent from the Alabama Department of Revenue to an independent contractor — Pash Company, Inc. — an official with the Department of Revenue wrote the administrator for Baldwin County to advise the administrator of the following:
 "During a routine audit of the records of Exxon Corporation, Mobile Bay project, which was begun prior to October 1, 1995, our Foreign Audit Specialist discovered the attached Baldwin County use tax liability. The amounts included in the attached schedule have not been verified in detail and should therefore be considered unaudited amounts. This information is being supplied under the exchange of information agreement between Baldwin County and the Alabama Department of Revenue. . . ."
On April 10, 1996, the director of auditing of Pash Company wrote the audit coordinator for Exxon to advise Exxon that it had received information reflecting a purported use-tax liability of Exxon and to assert that Exxon owed Baldwin County total use taxes in the amount of $449,819.75 for the audit period of January 19, 1991, through March 14, 1994. On June 20, 1996, an attorney in Exxon's tax department replied to Pash Company's director of auditing, advising him that Exxon's asserted use-tax liability to Baldwin County was prohibited by § 40-20-2(c) and (d), Ala. Code 1975. The attorney concluded the letter with the statement: "Accordingly, this proposed assessment should be withdrawn."
Baldwin County did not again pursue the matter until June 12, 2001, when it issued to Exxon its "notice of preliminary assessment," claiming not only the previously asserted use-tax liability but also accrued penalty and interest, bringing the total assessment to $605,913.37. On August 10, 2001, Exxon wrote Dan Bass, manager of the sales and use tax administration section of the Alabama Department of Revenue, asking for confirmation that during the three-year audit period, Exxon had filed all proper city and county use-tax returns, including those for Baldwin County, and that "there are no outstanding issues." Mr. Bass signed and returned a copy of the letter confirming that understanding.
Baldwin County persisted in its assertion of Exxon's use-tax liability, and Exxon *Page 308 
petitioned for administrative review of the preliminary assessment. After an administrative hearing, the hearing officer declined to set aside the assessment, and on October 5, 2001, Baldwin County issued its final assessment, including penalty and an increased interest amount, of $841,384.77. Exxon then appealed to the Baldwin Circuit Court which, after conducting a nonjury hearing, issued an order, amended on January 7, 2004, awarding Baldwin County a judgment against Exxon, including additional accrued interest, in the total amount of $949,045.79.
Exxon appealed the trial court's judgment to the Alabama Court of Civil Appeals. In its brief to that court, Exxon reviewed the history of § 40-20-2 and related Code sections and argued that under the plain language of § 40-20-2(c) and (d), the Baldwin offshore facility was exempt from the use tax imposed by Baldwin County. In its brief in response, Baldwin County argued that various rules of construction hostile to tax-exemption statutes supported its contention that its use tax could apply
 "to all those items of tangible personal property which were purchased by Exxon in Louisiana and incorporated into the construction of the platform and templates which were ultimately brought from Morgan City to Baldwin County where they came to rest when they were put into place at Exxon's gas wells in the submerged waters of Baldwin County."
In its reply brief, Exxon addressed the rules of construction relied on by Baldwin County, citing Bean Dredging, L.L.C. v.Alabama Department of Revenue, 855 So.2d 513 (Ala. 2003), for the basic proposition that the overriding purpose of any rule of statutory construction is to effectuate the intent of the legislature in enacting the statute and citing Gulf StevedoreCorp. v. Rabren, 286 Ala. 482, 242 So.2d 386 (1970), for the proposition that statutory tax exemptions should not be subjected to such strained constructions that the whole purpose of the statutory exemption is defeated. The Court of Civil Appeals affirmed the trial court's judgment without an opinion; one judge dissented. Exxon Mobil Corp. v. Baldwin County (No. 2030468, Dec. 30, 2004), 921 So.2d 478 (Ala.Civ.App. 2004) (table).
Exxon petitioned this Court for a writ of certiorari. We granted the petition to address an issue of first impression: whether the plain language of § 40-20-2(c) and (d) afforded Exxon an exemption from Baldwin County's use tax, an issue Exxon adequately raised in its initial brief to the Court of Civil Appeals.
 Standard of Review
In reviewing a decision of the Court of Civil Appeals on a petition for a writ of certiorari, this Court "accords no presumption of correctness to the legal conclusions of the intermediate appellate court. Therefore, we must apply de novo the standard of review that was applicable in the Court of Civil Appeals." Ex parte Toyota Motor Corp., 684 So.2d 132, 135 (Ala. 1996). Because the material facts before the Court of Civil Appeals were undisputed, that court's review of the trial court's ruling would be de novo as well. State Dep't of Revenue v.Robertson, 733 So.2d 397, 399 (Ala.Civ.App. 1998). This is particularly true where the intermediate appellate court is construing statutory provisions. Robertson, supra; Pilgrim v.Gregory, 594 So.2d 114, 120 (Ala.Civ.App. 1991).
 Analysis
The issue is whether Exxon's Baldwin offshore facility is exempt from Baldwin County's use tax by virtue of the limitations imposed on a county's taxing *Page 309 
power by § 40-20-2(c) and (d). We note that statutes that create an exemption from taxation are to be strictly construed against the exemption and in favor of the taxing party's right to tax.Ex parte Fleming Foods of Alabama, Inc., 648 So.2d 577, 578
(Ala. 1994). Whether these "limitations," as they are denominated in subsection (c), technically represent a tax "exemption" is an issue we need not decide. Both Exxon and Baldwin County expressly characterize subsections (c) and (d) as establishing tax exemptions; they disagree only as to whether the exemptions apply with respect to Baldwin County's use-tax ordinances. Accordingly, for the purposes of this case, but without deciding for any other context, we treat and analyze subsections (c) and (d) as tax-exemption clauses.
As always, it is this Court's responsibility in a case involving statutory construction to give effect to the legislature's intent in enacting a statute when that intent is manifested in the wording of the statute. Bean Dredging,855 So.2d at 517. A tax exemption must be expressed in clear and unambiguous terms and ought not to be deduced from language of doubtful import. Ex parte Emerald Mountain Expressway Bridge,L.L.C., 856 So.2d 834, 839 (Ala. 2003). Although tax-exemption clauses are to be construed most strongly against the party or person paying the tax, they are not to be so strictly construed as to defeat or destroy the intent and purpose of the statute containing the exemption clause, and no statutory construction should be accepted that would have that effect. State v.Advertiser Co., 257 Ala. 423, 427, 59 So.2d 576, 579 (1952);State v. Union Tank Car Co., 281 Ala. 246, 248-49,201 So.2d 402, 404 (1967); Rabren, 286 Ala. at 485, 242 So.2d at 388;Bean Dredging, 855 So.2d at 517; and Emerald Mountain,856 So.2d at 839. If the statute containing the tax-exemption clause expresses an intent to exempt certain property from taxation, judicial construction is not appropriate to defeat the exemption.Advertiser Co., 257 Ala. at 428, 59 So.2d at 579; Union TankCar Co., 281 Ala. at 249, 201 So.2d at 404; and Rabren,286 Ala. at 485, 242 So.2d at 388. "`"`If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"'" Pitts v. Gangi, 896 So.2d 433, 436 (Ala. 2004) (quoting DeKalb County LP Gas Co. v. Suburban Gas, Inc.,729 So.2d 270, 275 (Ala. 1998), quoting in turn earlier cases). In determining the intent of the legislature, we must examine the statute as a whole and, if possible, give effect to each section.Employees' Retirement Sys. of Alabama v. Head, 369 So.2d 1227,1228 (Ala. 1979).
The Code section that is now codified at § 40-20-2 was originally enacted in 1945. See Act No. 2, Ala. Acts 1945. As it was originally enacted, § 40-20-2 contained no limitation on the power of counties, cities, towns, or municipalities to impose taxes. Rather, that Code section simply established the "severance tax" in favor of the State, allocating a percentage of the severance taxes thereby collected "to the county in which the oil or gas was produced and to the municipalities therein" in specified proportions. On October 1, 1971, the legislature enacted Act No. 2057, which increased the basic severance-tax rate and also increased the share of the tax the qualifying counties and municipalities were entitled to receive. At the same time, the legislature imposed limitations on the authority of a county, city, town, or municipality to impose "any tax, fee, license or charge, whatsoever, directly or indirectly" with respect to specified subjects; this feature of the legislative "package" is now codified as subsections (c) and *Page 310 
(d), with the exception of the final sentence of (d), which was added in 1983 by Act No. 83-889, Ala. Acts 1983 (4th Special Session).[1] That final sentence reads: "Provided, however, no such taxes or licenses shall be levied on offshore drilling or production facilities as defined in Section 40-20-1."
Subsection (c) prohibits a county from "establish[ing], levy[ing], impos[ing], or collect[ing], as a condition of doing business or otherwise, any tax, fee, license or charge whatsoever, directly or indirectly, . . . upon the ownership, operation or maintenance of plants, facilities, machinery, pipelines, gathering lines or any equipment whatsoever, which are, or may be, necessary or convenient to the production, treating, processing, ownership, storage, sale, purchase, marketing or transportation of" oil or gas from beneath the soils or waters of the State. (Emphasis supplied.)
The legislature obviously resorted to "overkill" in the redundantly broad and all-encompassing language it used in subsection (c) to prevent a county or municipality that is receiving a share of the severance tax imposed on offshore drilling or production from levying, imposing, or collecting any other sort of tax on the ownership, operation, or maintenance of an offshore drilling or production facility. A county or a municipality is prohibited from levying "any tax, fee, license or charge whatsoever, directly or indirectly, . . . upon the ownership, operation or maintenance of . . . any equipmentwhatsoever, which are, or may be, necessary or convenient to the production, treating, processing, ownership, storage, sale, purchase, marketing or transportation of such oil or gas," i.e., oil or gas severed from beneath Alabama waters. (Emphasis supplied.) The addition to subsection (d) in 1983 of the proviso that "no such taxes or licenses shall be levied on offshore drilling or production facilities" simply further emphasized the absolute nature of the prohibition as to offshore drilling or production facilities as that term is defined in § 40-20-1. The legislative intent being so emphatically manifest, the rule of strict construction against a tax-exemption clause must give way to "`"the all-prevailing rule that a statute is to be construed in accordance with its real intent and meaning, and not so strictly as to defeat the legislative purpose"'. . . . Arbitrary rules of construction are of little value when the real intent of the legislature can be gathered from the act itself." State v.Taylor, 262 Ala. 639, 644, 80 So.2d 618, 621 (1954) (quotingAlabama-Georgia Syrup Co. v. State, 253 Ala. 49, 52,42 So.2d 796, 798 (1949), and State v. Calumet Hecla Consol. CopperCo., 259 Ala. 225, 232, 66 So.2d 726, 730 (1953)).
Baldwin County does not contend that subsections (c) and (d) are ambiguous. Rather, relying on the various rules of statutory construction hostile to the recognition of tax exemptions, it argues first that had the legislature intended to create a use-tax exemption by subsections (c) and (d) it could have easily done so by using the same phrasing it used in § 40-23-62 in which it granted various exemptions from the State-levied use tax. In each instance, the exemption in that Code section uses the same language used to establish the State use tax, i.e., exemptions from use-tax liability are granted with respect to "the storage, use, or other consumption" of various articles.
The answer to this argument is that the legislature was not attempting by subsections (c) and (d) simply to impose limitations *Page 311 
on, i.e., exemptions with respect to, use taxes. Rather, the legislature comprehensively and without exception prohibited counties and municipalities from imposing "any tax . . . whatsoever, directly or indirectly" with respect to the categories it listed. "Any," in the context used in subsection (c), means "all." Baldwin County is arguing, in effect, that the all-encompassing language used by the legislature in subsection (c) was overly broad, because that language neglected to specify explicitly that use taxes were included in the exemption granted therein. We can only presume that the legislature would understand and intend that "any tax, fee, license, or charge whatsoever" would necessarily embrace use taxes, as regards the "ownership [or] operation" of offshore drilling or production facilities.
Baldwin County also argues that because subsections (c) and (d) are part of the severance-tax statute, those subsections should be interpreted to mean only that counties and municipalities "should not levy similar taxes." (Baldwin County's brief, p. 20.) We do not consider that placement to suggest a legislative intent to limit the reach of subsections (c) and (d) to "similar taxes," i.e., severance taxes. Rather, the placement is logically consistent with the notion that granting a far-reaching local-tax exemption to owners and operators of "plants, facilities, machinery, pipelines, gathering lines or any equipment whatsoever" which were, or might be, necessary or convenient to the production, etc., of oil or gas in Alabama was a logical quid pro quo for the increase in the severance tax and the associated increase of the share of that tax being distributed to participating counties and municipalities. To place these limitations solely in the statute granting use-tax exemptions would have been misleading as to the omnibus nature of the limitations.
Section 40-20-1(10), Ala. Code 1975, defines "offshore drilling or production facilities" as "[b]arges, platforms or other drilling or production facilities located on submerged lands to drill or to produce oil or gas." It is undisputed that the Baldwin offshore facility was, in the language of the Baldwin County use-tax ordinance, "purchased for use in Baldwin County" as an offshore drilling or production facility. It became an offshore drilling or production facility once it was "located on [the] submerged lands" of Baldwin County "to drill or to produce oil or gas."
Attempting to avoid the restrictions clearly imposed by the legislature on the taxation of offshore drilling or production facilities, Baldwin County asserts in its brief to this Court that it is seeking to levy its use tax not on the Baldwin offshore facility, as such, but on the "numerous items of material, equipment and supplies which were utilized to construct [the] platform and templates" constituting the facility, there being "a distinction between the materials, equipment and supplies upon which the Baldwin County use tax was levied and the facilities described in § 40-20-2(c) and (d)." (Baldwin County's brief, pp. 18 and 24; also pp. 8 and 22.) Baldwin County is somewhat inconsistent in stating in its brief its position as to just when its use tax attached to those materials, equipment, and supplies, so that a tax liability accrued. At one point, Baldwin County argues that its tax "applies to the material, equipment and supplies which were utilized to construct the platform and templates even if that platform and those templates would be exempt from use tax . . . because the tax burden is fixed at the time of the purchase of those materials which is the taxable event even though they may be subsequently transformed into a non-taxable product." (Baldwin County's brief, p. 25.) The County cites Layne Central Co. v. Curry, 243 Ala. 165, 8 So.2d 839
(1942), *Page 312 
for this proposition. Layne Central is readily distinguishable, however. In that case, a company erecting a paper mill hired another company to furnish and install pump houses, well connections, and pipelines for water transmission. As later summarized in State v. Ingalls Iron Works Co., 274 Ala. 162,146 So.2d 87 (1962), the subcontractor in Layne Central
apparently
 "purchased out of the state certain raw materials (not fabricated for a special purpose) to be used by it in the construction of ` . . . pump houses, well connections and pipe-lines to convey the water necessary to the . . . manufacturing of . . . paper. . .'. The court held that the use tax applied inasmuch as none of the purchases constituted a completed project. The court said that the use tax was `. . . upon the contractor as the user of the raw material which entered into the construction of those structures before they came into use as such.' . . .
". . . .
 ". . . In the Layne case, . . . a use tax on raw items brought into Alabama was involved. Their subsequent fabrication by the taxpayer [subcontractor] for special purposes did not create an exemption."
274 Ala. at 164-66, 146 So.2d at 89-91.
Unlike the situation in Layne Central, here no raw materials entered the State of Alabama; rather, what entered Alabama was the completed project. The raw materials used in the construction of the platform and templates no longer retained their separate and individual identities. They had either been absorbed or consumed in the process or had become integrated and merged into the completed structures. In Layne Central, the raw materials purchased outside of Alabama were brought into Alabama and only thereafter used by the subcontractor in Alabama to build a completed project for the project owner; here, the raw materials purchased by the project owner were incorporated into the finished project out of state, and it was that finished project that subsequently entered Alabama.
Baldwin County argues at another point in its brief that the Alabama Department of Revenue had "concluded that the tax liability accrued in August 1993 `when the platform and templates entered State waters. . . .'" (Baldwin County's brief, p. 9.) The taxable event could not occur until that process of transportation in interstate commerce came to an end, however.
 "The levy of the [use] tax attaches after the act of transportation ends and the property comes to rest in this state for use or consumption. . . .
 "The insistence that the [use] statute burdens interstate commerce or otherwise impinges the constitutions, state or federal, is therefore without merit."
Paramount-Richards Theatres, Inc. v. State, 252 Ala. 54, 59,39 So.2d 380, 384 (1949). See also State v. Toolen, 277 Ala. 120,123, 167 So.2d 546, 549 (1964). Layne Central likewise notes that "`[a]s pointed out in [Henneford v. Silas Mason Co.,300 U.S. 577 (1937),] the fact that the buyer employs agencies of interstate commerce in order to effectuate his purchase is not material, since the tax is "upon the privilege of use after commerce is at an end."'" 243 Ala. at 168, 8 So.2d at 841. Baldwin County apparently embraces this legal principle, stating in its brief to this Court:
 "The levy of the tax attaches after the property comes to rest in Alabama. Paramount-Richards Theatres, Inc. v. State, 39 So.2d 380, 252 Ala. 54
(1949). The `storage, use or consumption' is the taxable event triggering the use tax liability. This liability attaches when the tangible personal property comes to rest *Page 313 
in Alabama regardless of the nature of the `storage, use or consumption' thereafter. Paramount-Richards Theatres, supra; State v. Toolen, 167 So.2d 546, 277 Ala. 120 (1964); State v. Smith, 55 So.2d 130, 256 Ala. 426 (1951)."
(Baldwin County's brief, p. 17.)
It is this latter statement of the taxable event that correctly states the rule to be applied. Baldwin County could not impose its use tax on the materials, equipment, and supplies used to construct the platform and templates in Morgan City, Louisiana, and it could not impose its use tax on the completed structures, which were transported across Alabama territorial waters as part of interstate commerce. Only when the platform and templates came to rest could there be a taxable event susceptible of the imposition of a use tax. Although the State did impose, and Exxon paid, such a use tax, the limitations imposed by § 40-20-2(c) and (d) do not apply to the State. The platform and templates came to rest when they were located on the submerged lands. As already noted, once they were "located on submerged lands to drill or to produce oil or gas," they achieved the status of offshore drilling or production facilities.
Finally, Baldwin County asserts that "[t]he Alabama Department of Revenue determined that Exxon owed the use tax to Baldwin County" and argues, without citation to any authority, that "[t]his interpretation of § 40-20-2(c) and (d) is entitled to given great weight." (Baldwin County's brief, p. 22.) Our cases have held that "a long-standing interpretation given a statute or ordinance by officials charged with its administration is highly persuasive as to . . . the meaning of the statute or ordinance,"City of Birmingham v. AmSouth Bank, N.A., 591 So.2d 473, 477
(Ala. 1991), and that "when the highest administrative officials charged with the duty of administering the tax laws have construed a tax statute, their construction should be given favorable consideration," Bean Dredging, 855 So.2d at 517. In the present case, however, the Department of Revenue made no formal determination that the limitations found in subsections (c) and (d) were unavailable to Exxon. The Department preliminarily audited Exxon for both State and Baldwin County tax matters in 1995 and later passed on to the administrator for Baldwin County a schedule of unaudited amounts from Exxon's records that might represent a local use-tax liability. The information was submitted to the administrator for Baldwin County by a Department of Revenue "disclosure officer," and apparently no formal determination concerning possible tax exemption was made by the department at any higher level and no assessment of any kind was issued by it for any use tax imposed by Baldwin County. As noted, in response to inquiry made by Exxon in August 2001, the manager of the department's sales and use tax administration section confirmed to Exxon that during the audit period in question Exxon had timely filed use-tax returns for Baldwin County and "there are no outstanding issues." Accordingly, assuming that Baldwin County has in mind the principles quoted above from AmSouth Bank and Bean Dredging, they have no application to the facts of this case.
 Conclusion
Having determined that the clear language of § 40-20-2(c) and (d) entitles Exxon to an "exemption" from the Baldwin County use tax under the facts and circumstances relating to the construction, transportation, and placement of the Baldwin offshore facility, we reverse the judgment of the Court of Civil Appeals and remand the case for that court to reverse the judgment of the Baldwin Circuit Court *Page 314 
in favor of Baldwin County and against Exxon as to Exxon's use-tax liability and to remand the case to the Baldwin Circuit Court, instructing that court to enter an order granting Exxon the relief it prayed for in its appeal from the final use-tax assessment, i.e., that the final assessment "be nullified and set aside in its entirety" and that Baldwin County, the Baldwin County Commission, and the Baldwin County Sales and Use Tax Department,[2] be restrained from taking any steps to collect the final assessment.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, SMITH, BOLIN, and PARKER, JJ., concur.
[1] Also, as noted earlier, at that same time the legislature granted to Baldwin County the authority to levy its own local 1% oil and gas severance tax. Act No. 2120, Ala. Acts 1971.
[2] In its notice of appeal to the Baldwin Circuit Court, Exxon names as "Appellees/Defendants" Baldwin County, the Baldwin County Commission, and the Baldwin County Sales and Use Tax Department. In response to Exxon's brief in this Court, those three entities filed a single brief and have consolidated their responses. Thus, we have treated Baldwin `County in this opinion as representing the interests of all three entities.