Rel: May 15, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

### SC-2024-0672

_____

## Ex parte Altonio Spencer

## PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS

## (In re: Altonio Spencer

## v.

## State of Alabama)

## (Mobile Circuit Court: CC-18-288; Court of Criminal Appeals: CR-2022-1213)

SC-2024-0672

BRYAN, Justice.

Altonio Spencer was convicted in the Mobile Circuit Court of pharmacy robbery and first-degree robbery. The trial court sentenced Spencer, as a habitual felony offender, to life in prison without the possibility of parole for the pharmacy-robbery conviction; the trial court also sentenced Spencer to 240 months in prison for the first-degree-robbery conviction. Spencer appealed to the Court of Criminal Appeals, which affirmed the pharmacy-robbery conviction and accompanying sentence. Spencer v. State, [Ms. CR-2022-1213, June 28, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024). That court reversed the first-degree-robbery conviction and sentence and remanded the case to the trial court with instructions that it vacate that conviction and sentence, which the trial court did. On August 9, 2024, on return to remand, the Court of Criminal Appeals affirmed the judgment in its entirety by unpublished memorandum. Spencer then petitioned this Court for a writ of certiorari, challenging that part of the Court of Criminal Appeals' opinion affirming his sentence for the pharmacy-robbery conviction, and we granted the petition. For the reasons discussed below, we reverse the judgment of

2

the Court of Criminal Appeals insofar as it affirmed Spencer's sentence for the pharmacy-robbery conviction, and we remand the case.

The issue in this case is whether the trial court was required to sentence Spencer to life in prison without the possibility of parole for his pharmacy-robbery conviction or whether the trial court instead had the discretion to sentence Spencer either to life in prison without the possibility of parole or simply life in prison, indicating the possibility of parole. Regarding that issue, tension exists between the sentencing requirements of the Habitual Felony Offender Act ("the HFOA"), § 13A-5-9, Ala. Code 1975, and the sentencing requirements of § 13A-8-52(a), Ala. Code 1975, which is a part of the Pharmacy Robbery Act of 1982 ("the Pharmacy Robbery Act"), § 13A-8-50 through -52, Ala. Code 1975. In this case, given Spencer's four previous felony convictions, the State invoked the HFOA regarding Spencer's pharmacy-robbery conviction under the Pharmacy Robbery Act. The HFOA provides that a defendant, like Spencer here, who is convicted of a Class A felony and who has at least three prior felony convictions but no prior convictions for a Class A felony "must be punished by imprisonment for life <u>or</u> life without the possibility of parole, <u>in the discretion of the trial court</u>." § 13A-5-9(c)(3) (emphasis

3

added).[1]  On the other hand, the relevant part of the Pharmacy Robbery Act, § 13A-8-52(a), provides that a defendant, like Spencer here, who is convicted of pharmacy robbery but who does not have a previous pharmacy-robbery conviction "shall be imprisoned at hard labor for not less than 10 years nor more than 99 years <u>and shall be ineligible for consideration for parole</u>, probation or suspension of sentence." (Emphasis added.) [2]

The Court of Criminal Appeals discussed how the tension between the HFOA and § 13A-8-52(a) was evident in the trial court:

"The State … argued [to the trial court] that, given [Spencer's previous] four convictions, the [HFOA] … required the trial court to sentence Spencer to either life imprisonment without the possibility of parole or life imprisonment for his

---

[1]In a 2000 amendment to the HFOA, the legislature added this provision in § 13A-5-9(c)(3) giving a trial court the discretion to impose a sentence of life imprisonment or life imprisonment without the possibility of parole.  <u>See</u> Act No. 2000-759, § 1, Ala. Acts 2000.  "Before [the 2000] amendment, a sentence of life imprisonment without the possibility of parole was mandatory under § 13A-5-9(c)(3) …."  <u>Kirby v. State</u>, 899 So. 2d 968, 969 (Ala. 2004).

[2]Section 13A-8-52(b), Ala. Code 1975, addresses multiple convictions for pharmacy robbery and, like § 13A-8-52(a), also has a provision prohibiting consideration for parole: "On a second or subsequent conviction under this article, [<u>i.e.</u>, the Pharmacy Robbery Act,]  the offender shall be imprisoned for the remainder of his natural life and shall be ineligible for consideration for parole, probation or suspension of sentence."

> pharmacy-robbery conviction.  The State noted, though, that § 13A-8-52, Ala. Code 1975, provides that any person who is convicted of pharmacy robbery is not eligible for parole.  Thus, the State argued that, in this case, the trial court was required to sentence Spencer to life imprisonment without the possibility of parole for his pharmacy-robbery conviction.  The trial court agreed with the State and imposed that sentence, finding that it did not 'have the leeway to give [Spencer] any leniency' and was 'required by law, given [Spencer's] past history, to impose a sentence of life in prison without the possibility of parole.'  (R. 593.)"

___ So. 3d at ___.

On appeal, Spencer argued that he had been improperly sentenced for the pharmacy-robbery conviction.  Spencer contended that, under the HFOA, the trial court had the discretion to sentence him either to life imprisonment or life imprisonment without the possibility of parole; he argued that the trial court mistakenly concluded that, in light of § 13A-8-52(a), it could sentence him to only life imprisonment without the possibility of parole.  The Court of Criminal Appeals agreed that Spencer was required to be sentenced under the HFOA.  However, that court then observed that the Pharmacy Robbery Act provides that a defendant convicted of pharmacy robbery is ineligible for parole.  Thus, the Court of Criminal Appeals determined that "the trial court correctly recognized that a sentence of life imprisonment under the HFOA would effectively

5

be a sentence of life imprisonment without the possibility of parole because no person who is convicted of pharmacy robbery is eligible for parole" under the Pharmacy Robbery Act. ___ So. 3d at ___. Therefore, the Court of Criminal Appeals concluded that "the trial court did not 'improperly sentence' Spencer for his pharmacy-robbery conviction" by sentencing him to life imprisonment without the possibility of parole without exercising the discretion called for under the relevant HFOA provision. ___ So. 3d at ___.

Spencer argues that the Court of Criminal Appeals erred by concluding that the trial court correctly sentenced him for his pharmacy-robbery conviction. Spencer contends that, under the plain language of the HFOA, the trial court had the discretion to sentence him either to life imprisonment -- indicating the possibility of parole -- or life imprisonment without the possibility of parole. "'"[T]his Court reviews de novo a [lower] court's [application] of a statute, because only a question of law is presented."'" Easterling v. Progressive Specialty Ins. Co., 251 So. 3d 767, 771 (Ala. 2017) (quoting State Farm Mut. Auto. Ins. Co. v. Bennett, 974 So. 2d 959, 961 (Ala. 2007), quoting in turn Scott Bridge Co.

6

v. Wright, 883 So. 2d 1221, 1223 (Ala. 2003)).  Our review is further guided by the following principles regarding the application of statutes:

> "'"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says.  If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."'"

Deutsche Bank Nat'l Tr. Co. v. Walker Cnty., 292 So. 3d 317, 325 (Ala. 2019) (quoting Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So. 2d 293, 296 (Ala. 1998), quoting in turn IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So. 2d 344, 346 (Ala. 1992)).  "If the language of a statute is not 'plain' or is ambiguous, then -- and only then -- may a court construe or interpret it to determine the legislature's intent."  Deutsche Bank, 292 So. 3d at 326.

Spencer's principal argument is straightforward: The HFOA applies to his pharmacy-robbery conviction, the terms of the HFOA are mandatory, and, under the plain language of those terms, the trial court had the discretion to sentence him either to life imprisonment or life imprisonment without the possibility of parole.  We agree.  The State invoked the HFOA in the trial court, and it is undisputed that the HFOA

applies. If invoked and applicable, the HFOA "is mandatory in that it provides that a repeat felony offender 'must be punished' in accordance with its provisions." Ex parte Chambers, 522 So. 2d 313, 315 (Ala. 1987) (emphasis omitted). See also Connolly v. State, 602 So. 2d 452, 453 (Ala. 1992) (stating that a sentence imposed under the HFOA "was mandatory because the State had invoked the [HFOA] … and had proved … that [the defendant] had been convicted of three prior felonies"). The relevant HFOA provision is plain and unambiguous: Spencer "must be punished by imprisonment for life or life without the possibility of parole, in the discretion of the trial court." § 13A-5-9(c)(3). "'When the language of a statute is plain and unambiguous, as in this case, courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning ....'" Ex parte Smith, 327 So. 3d 184, 188 (Ala. 2020) (quoting Ex parte T.B., 698 So. 2d 127, 130 (Ala. 1997)). The relevant HFOA provision gives the trial court the discretion to sentence offenders like Spencer either to life imprisonment or life imprisonment without the possibility of parole. Thus, the Court of Criminal Appeals erred in determining that the trial court correctly concluded that it was required to sentence Spencer to life imprisonment without the possibility of parole

8

in light of the prohibition against parole found in § 13A-8-52(a). In short, Spencer was required to be sentenced under the HFOA, and, under the plain terms of that statute, the legislature gave the trial court the discretion to sentence Spencer either to life imprisonment -- indicating the possibility of parole -- or life imprisonment without the possibility of parole.

The trial court effectively sentenced Spencer under a hybrid of the HFOA and § 13A-8-52(a): His sentence was enhanced under the HFOA, but he was made ineligible for parole under § 13A-8-52(a). Section § 13A-8-52(a) provides for a sentence of a term of years only; although Spencer's sentence was enhanced under the HFOA, the trial court did not sentence him under a correct understanding of the terms mandated by the HFOA. Our decision today simply applies the applicable HFOA language exactly as written by the legislature and ensures that Spencer will be sentenced under the plain terms of that statute.

The State argues that the HFOA was intended to enhance sentences and creates only a floor for punishment, not a ceiling. The State primarily argues that, given that context, "[i]t makes far more sense to apply the [HFOA and § 13A-8-52(a)] together as the lower courts

9

did here." State's brief at 11. Thus, the State primarily argues that, applying both those statutes together, we should conclude that the trial court was required to sentence Spencer to life imprisonment without the possibility of parole. That is, the State reads § 13A-8-52(a) as essentially restricting the terms of the HFOA insofar as § 13A-8-52(a) states that a defendant convicted of pharmacy robbery is ineligible for parole. In making that argument, the State seems to implicitly contend that the relevant provision of the HFOA, although not ambiguous on its face, is ambiguous in this case when considered in light of that statute's context and the provision in § 13A-8-52(a) prohibiting parole. Thus, the State basically asks us, in light of the HFOA's context and § 13A-8-52(a), to construe the HFOA in a way that essentially omits the provision in the HFOA granting the trial court discretion in sentencing. Secondarily, the State cites various rules of statutory construction in arguing for affirmance.

Thus, the State argues that we should construe the HFOA as requiring the trial court to sentence Spencer to life imprisonment without the possibility of parole. However, as noted, the relevant provision of the HFOA plainly gives the trial court the option to sentence Spencer to life

10

in prison only, indicating the possibility of parole.  A court may construe a statute only "[i]f the language of a statute is not 'plain' or is ambiguous." Deutsche Bank, 292 So. 3d at 326.  In determining the meaning of a statute, "our inquiry begins with the language of the statute, and if the meaning of the statutory language is plain, our analysis ends there."  Ex parte McCormick, 932 So. 2d 124, 132 (Ala. 2005).  That is the situation here.  Because the language of the HFOA is plain and unambiguous, our evaluation ends there, and we will not construe it.

The HFOA applies in this case, its terms are mandatory, and, under the plain terms relevant here, the trial court had the discretion to sentence Spencer either to life imprisonment or life imprisonment without the possibility of parole for his pharmacy-robbery conviction. The trial court mistakenly concluded that it was required to sentence Spencer to life imprisonment without the possibility of parole. The Court of Criminal Appeals mistakenly determined that the trial court correctly concluded that it was required to sentence Spencer to life imprisonment without the possibility of parole.  Accordingly, we reverse the judgment of Court of Criminal Appeals insofar as it affirmed Spencer's sentence for

11

pharmacy robbery, and we remand the case for proceedings consistent with this opinion.

REVERSED AND REMANDED.

Stewart, C.J., concurs.

Shaw and Cook, JJ., concur specially, with opinions.

Parker, J., concurs in the result, with opinion.

Sellers, J., dissents, with opinion.

Mendheim, J., dissents, with opinion, which Wise, J., joins.

McCool, J., recuses himself.

SHAW, Justice (concurring specially).

I concur in the main opinion. I write specially to note the following.

When the Habitual Felony Offender Act ("the HFOA"), § 13A-5-9, Ala. Code 1975, is applicable, it is implemented in lieu of the default sentence available for a criminal offense. The HFOA, by its terms, is applicable to "all cases" meeting the criteria supplied by that Code section. See, e.g., § 13A-5-9(c) ("In <u>all cases</u> when it is shown that a criminal defendant has been previously convicted of any three felonies ... he or she <u>must be punished as follows</u> ...." (emphasis added)). Unless the default sentence of an offense, by its text, indicates that a sentence required by the HFOA is modified or does not apply, and I see no such language in the portion of the pharmacy-robbery statute at issue in this case, § 13A-8-52(a), Ala. Code 1975, then the sentence supplied by the HFOA applies. Without statutory support, a sentence cannot be cobbled together from portions of a default sentence and portions of the HFOA. If the legislature intended a different result, then the statutes at issue should, by their plain language, reflect that intent.

COOK, Justice (concurring specially).

I concur with the well-reasoned main opinion. I write specially, however, to suggest a more fulsome description of the "plain meaning" rule. I also write to explain how this rule could be harmonized with the "original public meaning" rule should our Court decide to expressly adopt that rule one day.

I. The "Plain Meaning" Rule

I begin with the "plain meaning" rule. As explained in the main opinion, that rule is as follows:

> "'"'Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"'"

___ So. 3d at ___ (quoting Deutsche Bank Nat'l Tr. Co. v. Walker Cnty., 292 So. 3d 317, 325 (Ala. 2019), quoting in turn Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So. 2d 293, 296 (Ala. 1998), quoting in turn IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So. 2d 344, 346 (Ala. 1992)). As the main opinion observes, our Court has repeatedly stated and relied upon this rule.

14

In a recent law-review article, former Justice Jay Mitchell explained that the "plain meaning" rule "effectively operates in Alabama as a two-step injunction." Jay Mitchell, Textualism in Alabama, 74 Ala. L. Rev. 1089, 1108 (2023). That "two-step injunction," he says, is as follows:

> "Step 1: Read the text and decide -- without engaging in 'construction' -- whether the meaning of the text is plain.
>
> "Step 2: If the meaning is plain, apply it. If not, resort to judicial 'construction' to help illuminate its meaning."

Id. at 1108-09.

Our Court has typically used the first of these two steps in determining whether a statute's meaning is "plain." As the main opinion correctly notes, we have only reached the second step if we determine that the meaning of the text is not "plain." See ___ So. 3d at ___ ("'If the language of a statute is not "plain" or is ambiguous, then -- and only then -- may a court construe or interpret it to determine the legislature's intent.'" (quoting Deutsche Bank, 292 So. 3d at 326)).

### A. To Determine the "Plain Meaning" of a Statute, There Must Be At Least Some Construction Made of the Words Used in That Statute

"Any act of ascribing meaning to words requires the reader to

15

construe those words." Mitchell at 1109. Thus, the "plain meaning" rule can "seem[] circular." Id.

One author agrees with this position, observing that "all terms require interpretation on some level, in the sense that all persons bring their own understanding of language to bear on anything that they read." Marc James Ayers, Unpacking Alabama's Plain-Meaning Rule of Statutory Construction, 67 Ala. Law. 31, 34 (2006).

In his effort to explain our plain-meaning-rule caselaw, former Justice Mitchell writes:

> "The way our court has avoided this circularity is by tacitly drawing a distinction between 'interpretation' on the one hand and 'construction' on the other. Interpretation -- that is, the bare act of looking at written words and intuiting their meaning -- is something all people do automatically whenever they read language. But 'construction' (at least for purposes of our court's plain-meaning-rule cases) involves something extra -- some additional work or some extra considerations on the part of the judge -- which judges are supposed to avoid unless the text is ambiguous.
>
> "So what is the plus factor that transforms (necessary) interpretation into (forbidden) construction? Our precedents do not give a clear answer. Some of our cases seem to indicate that judges engage in forbidden 'construction' whenever they consult any source other than the isolated statutory provision. Other cases suggest that the plain-meaning rule prevents judges from engaging in policy considerations or consulting subjective-intent evidence unless the text is ambiguous but that it does not prohibit judges from considering sources that

16

shed light on the text's objective semantic meaning (such as historical context, related statutory provisions, descriptive canons of construction, and so on). That inconsistency permeates our plain-meaning-rule jurisprudence."

Mitchell at 1109 (footnotes omitted).

To resolve this apparent "circularity," he suggests, and I agree, that there are certain constructive canons that are inherent within the plain-meaning-rule analysis.

### B. Rules of Grammar, Usage, Context, etc. -- that is, Semantic Canons -- and Use of Dictionaries Should Be Part of the Plain-Meaning-Rule Analysis

Like all courts, our Court "relies on canons of construction to aid our textual interpretation." Mitchell at 1104. In my view, one class of canons that is used to determine whether or not the meaning of a statute is "plain" is the class of "semantic canons."  Former Justice Mitchell labels these as "descriptive canons."

As he explains in his law-review article,

"'[d]escriptive canons -- also called <u>semantic</u> or <u>linguistic</u> canons -- encompass <u>all rules of grammar, usage, and context that help a reader understand what a text means</u>. Familiar examples include the general/specific canon (if there is a conflict between a general statement and a specific one, the specific prevails), the associated-words canon (words in a list bear on each other's meaning), and the gender/number canon (abstract masculine pronouns include the feminine, abstract singular nouns include plural nouns, and vice versa). While

17

there are many varieties of descriptive canons -- 'semantic,' 'syntactic,' 'contextual,' and so on -- the ultimate point of each is the same: to describe how reasonable English speakers use and understand our language, including legal language."

Id. at 1104-05 (final emphasis added; footnote omitted).[3] He then cites several cases in which our Court has considered such semantic canons when engaging in statutory interpretation.[4]

_____

[3]In contrast, I do not believe that other types of canons, such as the prescriptive canons, would be particularly helpful in this endeavor. As former Justice Mitchell explains:

"Prescriptive canons are different. Prescriptive canons -- sometimes called substantive or normative canons -- do not tell judges how to ascertain the most plausible meaning of a text; instead, they tell judges how to choose between multiple (already-ascertained) possible meanings, usually by appealing to policy-based principles. The most notable examples of prescriptive canons include the federal doctrine of Chevron[ U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984),] deference, and Alabama's parallel doctrine that judges should defer to an agency's interpretation of a statute that the agency is charged with enforcing, even if the agency's interpretation 'may not appear as reasonable as some other interpretation.'"

Id. at 1105 (footnotes omitted).

[4]See, e.g., Alabama Dep't of Revenue v. Greenetrack, Inc., 369 So. 3d 640, 650 (Ala. 2022) (applying the "whole act" canon and collecting cases); State Farm Fire & Cas. Co. v. Lambert, 291 Ala. 645, 648, 285 So. 2d 917, 918 (1973) (determining that questions of statutory interpretation "cannot be answered apart from the historical context within which the statute was passed"); Ex parte Emerald Mountain Expressway Bridge, L.L.C., 856 So. 2d 834, 839-84 (Ala. 2003) (invoking

Another author has cited still more cases in which our appellate courts have applied the "plain meaning" rule and, in doing so, have also relied on "rules of grammar, usage, and context" to determine what a particular text or statute means.[5] And, there are other instances where our appellate courts have cited external sources in applying the "plain meaning" rule, such as dictionaries (both ordinary and legal), as well as the publication Words and Phrases, and other works discussing commonly understood rules of grammar.[6]

---

an anti-tax-exemption canon, a type of clear-statement canon, without a threshold finding of ambiguity); and Ex parte Jenkins, 723 So. 2d 649, 655-60 (Ala. 1998) (applying the anti-retroactivity canon without a threshold finding of ambiguity).

[5]See, e.g., Ayers at 36 n.5 (recognizing that "the in pari materia rule might sometimes be utilized to determine 'plain meaning' without a finding of ambiguity"); Ex parte Exxon Mobil Corp., 926 So. 2d 303, 309 (Ala. 2005) ("In determining the intent of the legislature, we must examine the statute as a whole and, if possible, give effect to each section."); Richardson v. Terry, 893 So. 2d 277, 283-86 (Ala. 2004) (applying the reasoning in DeKalb Cnty. LP Gas Co. v. Suburban Gas Co., 729 So. 2d 270, 276 (Ala. 1998), in conjunction with the in pari materia rule); Skelton v. J & G, LLC., 922 So. 2d 926, 931 (Ala. Civ. App. 2005) (same); Siegelman v. Alabama Ass'n of Sch. Bds., 819 So. 2d 568, 582 (Ala. 2001) ("In construing statutes, this Court does not interpret provisions in isolation, but considers them in the context of the entire statutory scheme." (emphasis omitted)).

[6]See Ayers at 35 ("For example, the advocate might appeal to dictionaries such as Black's or Webster's, sources that are undoubtedly

Based on the foregoing, it seems evident to me that, in determining whether the meaning of a law is "plain," a judge must <u>at least</u> apply the normal "rules of grammar, usage, and context that help a reader understand what a text means." Mitchell at 1104-05. It also seems obvious to me that this is what our Court has actually been doing over the last several decades.

## II. Harmonizing the "Plain Meaning" Rule with the "Original Public Meaning" Rule

There remains the question of whether the "plain meaning" rule fits with the "original public meaning" rule. As I have written, I support following the "original public meaning" of statutory or constitutional text

---

not part of the <u>Alabama Code</u> -- and are thus technically 'outside' sources -- but are nonetheless frequently cited by Alabama's appellate courts in search of the 'plain meaning.' See, e.g., <u>Blackmon v. Brazil</u>, 895 So. 2d 900, 907 (Ala. 2004) (citing <u>Black's Law Dictionary</u>); <u>Ex parte Lamar Adver. Co.</u>, 849 So. 2d [928,] 930 [(Ala. 2002)] (citing <u>Merriam-Webster's Collegiate Dictionary</u>); cf. <u>Ex parte Director, State Dep't of Indus. Relations</u>, [915] So. 2d [1169, 1177] (Ala. 2005) (citing cases that rely upon Words and Phrases to interpret the phrase 'with respect to'). Another example might be an appeal to authoritative works on, or general knowledge of, the commonly-understood rules of grammar. Cf. <u>Padgett v. Conecuh County Comm'n</u>, 901 So. 2d 678, 685-88 (Ala. 2004) (adopting the trial court's detailed discussion of the grammatical structure of a statute and a constitutional amendment).").

20

when trying to determine what a particular word or phrase means. See, e.g., Jennings v. Smith, [Ms. SC-2025-0372, Mar. 13, 2026] ____ So. 3d ____, ____ n.10 (Ala. 2026) (Cook, J., concurring specially); Ex parte Underwood, [Ms. SC-2024-0263, June 27, 2025] ____ So. 3d ____, ____ n.4 (Ala. 2025) (Cook, J., concurring specially); LePage v. Center for Reprod. Med., P.C., 408 So. 3d 678, 711-12 (Ala. 2024) (Cook, J., dissenting). As the United States Supreme Court has previously explained, the "original public meaning" rule is a "'"fundamental canon of statutory construction"'" that should generally mean that the words "'should be "interpreted as taking their ordinary … meaning …  at the time Congress enacted the statute."'" New Prime Inc. v. Oliveira, 586 U.S. 105, 113 (2019) (quoting Wisconsin Cent. Ltd. v. United States, 585 U.S. 274, 284 (2018), quoting in turn Perrin v. United States, 444 U.S. 37, 42 (1979)) (emphasis added).[7]

The "original public meaning" rule is an important anchor that

_____

[7]In Reading Law: The Interpretation of Legal Texts 33 (Thomson/West 2012), Justice Antonin Scalia and Bryan A. Garner explain that, when a court is required to interpret the words in a statute through pursuit of the statute's original public meaning, it should consider "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." (Emphasis added.)

21

protects the separation of powers and ensures that our Court respects the decisions of the Legislature and stays within our judicial role. As I wrote in Ex parte Underwood:

> "I believe that we are required to apply the 'original public meaning' of the words in a statute or our Constitution, thus ensuring that we do not apply our own subjective meaning to the words used. ... Because our Court is in the judicial branch, our role is limited, and applying the 'original public meaning' of the words in a statute helps this Court to stay within its constitutional role, which is a fundamental part of democracy. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, § 7, pp. 82-83 (Thomson/West 2012) ('Originalism is the only approach to text that is compatible with democracy. When government-adopted texts are given a new meaning, the law is changed; and changing written law, like adopting written law in the first place, is the function of the first two branches of government -- elected legislators and ... elected executive officials and their delegates.'). See also Jay Mitchell, Textualism in Alabama, 74 Ala. L. Rev. 1089, 1092 (2023) ('[T]he meaning of a law is its original public meaning, not its modern meaning.')."

____ So. 3d at ____ n.4 (Cook, J., concurring specially).

In my view, the "original public meaning" rule fits well with the "plain meaning" rule because both of these rules are essentially saying the same thing -- that is, that a court must, if at all possible, be bound to the words of the text of the statute passed by the Legislature. As our Court has repeatedly stated, "it is our job to say what the law is, not to

say what it should be." <u>DeKalb Cnty. LP Gas Co. v. Suburban Gas</u>, 729 So. 2d 270, 276 (Ala. 1998). Both rules are grounded in separation of powers, a principle expressly set forth in the Alabama Constitution. <u>See</u> Art. III, § 42(c), Ala. Const. 2022 (stating that, "[t]o the end that the government of the State of Alabama may be a government of laws and not of individuals, and except as expressly directed or permitted in this constitution, … the judicial branch may not exercise the legislative or executive power"). <u>See</u> <u>also</u> Ayers at 32.

But our Court has never expressly adopted the "original public meaning" rule. Although Justices on our Court have discussed this rule in their writings[8] and the Alabama Court of Criminal Appeals has expressly adopted this rule in binding, majority opinions, our Court has not taken the extra step and incorporated it into our own statutory-interpretation framework with the "plain meaning" rule.[9]

To harmonize these rules, I suggest that the "plain meaning" rule

---

[8]<u>See, e.g.</u>, <u>Barnett v. Jones</u>, 338 So. 3d 757, 766-69 (Ala. 2021) (Mitchell, J., concurring specially); <u>LePage</u>, 408 So. 3d at 689-90 (Parker, C.J., concurring specially).

[9]<u>See, e.g.</u>, <u>Flynn v. State</u>, 409 So. 3d 80, 99 (Ala. Crim. App. 2024); <u>Ex parte Carter</u>, 420 So. 3d 444, 452 (Ala. Crim. App. 2024).

should be applied to the ordinary meaning of the language in a statute <u>at the time</u> of the passage of the statute.  With that clarification,  it appears to me that these rules should be considered equivalent in our framework.

<u>III. Why These Tools Matter for Statutory Interpretation</u>

Although I agree with Justice Sellers that common sense has a place in statutory interpretation, I respectfully disagree with his position that the tools that our Court has consistently used for this purpose, such as the canons of construction discussed above, lead to "confusion, delay and sometimes contradictory conclusions." ____ So. 3d at ____ (Sellers, J., dissenting).[10] Contrary to Justice Sellers's view, these tools exist to <u>resolve confusion</u> not to create it.

In the easy cases, it is certainly true that a commonsense reading of the words or phrases used in a statute will lead to the correct result. In those cases, the commonsense, "plain meaning" of the words used will correspond to a definition we can find in a dictionary and to a basic grammar rule we learned in school.  In short, all of the signs will point in one direction.  But they are still signs.  These signs are forms of canons

---

[10]I acknowledge that the semantic canons that I mention above are less well-known. <u>See, e.g.</u>, Mitchell at 1117-33 (providing an appendix listing all of the canons of construction).

of construction. In other words, whether we as judges actually look up the grammar rule or the definition, we are still applying these basic construction rules even if we do not say so or even realize it.

The problem, however, comes in the harder cases. In the harder cases, the common sense of one judge may be very different from the common sense of another judge. The harder cases often involve statutory language that is far less clear or involve interaction between statutes that may not have been considered when they were enacted (perhaps at different times). Such cases often involve good lawyers on both sides, making compelling arguments in well-written briefs. It is in those cases where the statutory-construction tools are especially vital.

Justice Sellers is correct that, in those harder cases, some of the statutory-construction canons may point us in different directions. But this is not a flaw in those tools. Instead, it is a reflection of the difficulty of those cases. And, the fact that we may need to consider a longer list of statutory-construction canons, some of which may be less intuitive or well-known, in deciding those harder cases is also not a flaw, but a reflection of the difficulty of those cases. See, e.g., Mitchell at 1117-33 (providing an appendix listing all of the canons of construction).

The reality that these tools may not provide certain answers every time in the harder cases is not a reason for us to avoid using these tools or to weaken our efforts to understand and follow the instructions of the Legislature. In my view, as judges, one of our most important goals should be to confine ourselves to the meaning of the written words adopted by our duly-elected legislators. Following preexisting, objective tools, like the canons of construction, is one way to accomplish this.

When we apply these preexisting, objective tools, we are not entangling ourselves "in minutiae." \_\_\_\_ So. 3d at \_\_\_\_ (Sellers, J., dissenting). Instead, we are seeking ways to predictably resolve disputes between the parties over the meaning of the words. We are also trying to persuade our fellow judges why our interpretation of the words or phrases used in a statute is correct. By using such tools, we reach the outcome the law requires and avoid substituting our own personal prejudices and beliefs for the intent of the Legislature. As the well-established precedent of our Court demonstrates, this is something that our Justices have been doing for many decades, and these canons of construction are the result of years of effort. See nn. 5 and 6, supra.

With the foregoing in mind, I also wish to address Justice Sellers's position that "[o]ur fundamental role is to decide cases, not to create precedent." ___ So. 3d at ___ (Sellers, J., dissenting). Our Court granted certiorari review in this case for the purpose of deciding a "material question ... of first impression." <u>See</u> Rule 39(a)(1)(C), Ala. R. App. P. Specifically, we have been asked to decide how the language of the Habitual Felony Offender Act ("the HFOA"), § 13A-5-9, Ala. Code 1975, and the sentencing requirements of § 13A-8-52(a), Ala. Code 1975, which is a part of the Pharmacy Robbery Act of 1982, § 13A-8-50 through -52, Ala. Code 1975, interact with one another.[11]

In other words, we granted certiorari review for the express purpose of creating precedent. For the reasons fully explained in the main opinion, I believe we are correctly establishing precedent, and thus I agree that the language of the HFOA and the sentencing requirements of § 13A-8-52(a) demonstrate that the trial court must apply its discretion when sentencing a defendant, like Altonio Spencer, to either life

---

[11]Altonio Spencer, the petitioner, also argued in the alternative that the Court of Criminal Appeals' decision "directly conflicts" with prior precedent construing the HFOA. <u>See</u> Rule 39(a)(1)(D), Ala. R. App. P.

imprisonment or life imprisonment without the possibility of parole for a pharmacy-robbery conviction.

While our decision today may (or may not) ultimately change the outcome for Spencer,[12] it is still the job of our Court to establish precedent that correctly interprets these statutes so that Alabama's trial courts can correctly and predictably apply these sentencing requirements in future criminal cases. Thus, I must respectfully disagree with Justice Sellers's position.

IV. Conclusion

For the reasons stated above, I encourage future litigants to cite semantic canons when arguing the plain meaning of statutory or constitutional language. I also encourage future litigants to raise the original public meaning of statutes in cases brought before our Court in the hope that our Court may one day consider expressly adopting the "original public meaning" rule and also expressly harmonizing it with our

---

[12]Indeed, on remand, it is possible that the trial court may determine, in its discretion, that Spencer's sentence should be life imprisonment without the possibility of parole. However, even if the trial court determines that he should receive a sentence of life imprisonment with the possibility of parole, Spencer will only be given the opportunity to convince the parole board that he is entitled to parole after first serving at least 15 years of his sentence.

existing "plain meaning" rule. As demonstrated above, such tools matter and can only further assist our Court in reaching the right result in the cases that come before us.

PARKER, Justice (concurring in the result).

I agree that the Habitual Felony Offender Act required someone with Spencer's criminal history to "be punished by imprisonment for life or life without the possibility of parole, <u>in the discretion of the trial court</u>." Ala. Code 1975, § 13A-5-9(c)(3) (emphasis added). And because the circuit court erroneously believed it lacked such discretion, I agree that the Court of Criminal Appeals' judgment is due to be reversed and that the case is due to be remanded for Spencer to be resentenced.

I write separately, however, to emphasize why this result does not mean that Spencer will ever be eligible for parole consideration. To the contrary, the Pharmacy Robbery Act of 1982, §§ 13A-8-50 to -52, Ala. Code 1975, expressly precludes this possibility regardless of what sentence the circuit court selects on remand. It says that an offender convicted of pharmacy robbery "shall be ineligible for consideration for parole, probation or suspension of sentence." Ala. Code 1975, § 13A-8-52(a).

It is certainly possible to perceive tension between the HFOA and the pharmacy-robbery act's parole-eligibility bar if one reads that latter provision as a constraint on a trial court's sentencing discretion. But I do

not read the parole-eligibility bar that way. I read it instead as a direction to parole authorities not to let a covered offender come up for a parole hearing.

On this reading, the pharmacy-robbery act's parole-eligibility bar is no different from any number of other parole-eligibility bars currently governing the parole process. One such provision prohibits parole for certain repeat violent offenders. See Ala. Code 1975, § 15-22-27.1. Another prohibits parole for repeat Class A felons sentenced to imprisonment for life. See Ala. Code 1975, § 15-22-27.2. Still another prohibits parole for anyone convicted of certain sex offenses involving a child. See Ala. Code 1975, § 15-22-27.3(a). To my knowledge, these provisions do not affect the sentence actually imposed by a trial court. But they nevertheless deny parole eligibility on the "back end" -- that is, when parole officials consider whether to set "a prisoner's initial parole consideration date." Ala. Code 1975, § 15-22-28(e).

Perhaps the Legislature may someday amend the parole-eligibility bar imposed by the pharmacy-robbery act. (That possibility, in my view, is why the erroneous sentence below does not constitute harmless error.) But until then, it operates to limit and restrict the parole authorities

when scheduling parole hearings. And "limitations and restrictions on the powers of the [parole] board or the members thereof shall be strictly construed." Ala. Code 1975, § 15-22-38.

"Where possible, statutes should be resolved in favor of each other to form one harmonious plan ...." League of Women Voters v. Renfro, 292 Ala. 128, 131, 290 So. 2d 167, 169 (1974) (citing Waters v. City of Birmingham, 282 Ala. 104, 109, 209 So. 2d 388, 392 (1968); Walker Cnty. v. White, 248 Ala. 53, 55, 26 So. 2d 253, 255 (1946)). For the reasons set forth above, the HFOA and the pharmacy-robbery act's parole-eligibility bar can be, and therefore must be, harmonized in this case.

SELLERS, Justice (dissenting).

I respectfully dissent from the main opinion. I agree with Justice Mendheim, whose writing expresses my concerns with the opinion. I write only to respond to Justice Cook's special concurrence. I fear we are at a crossroads in the American judicial system and run the risk of misinterpreting the role of courts on both the state and federal level. Our fundamental role is to decide cases, not to create precedent. A case decided correctly and explained thoroughly may be precedential, but the precedent is ancillary to deciding the real controversy and dispute between litigants. There is a peculiar hazard that arises when language in constitutions, statutes, and cases becomes overanalyzed to the point of obscurity. Imagine a "semantic cannon," a device that fires volleys of interpretive theories, linguistic rules, and analytical frameworks at any given phrase. At first, this might seem like a powerful tool for precision. But, in practice, its blast radius often causes more confusion than clarity, creating collateral damage that can obscure the goal of explaining what a word, term, or phrase simply means.

By consulting the many established canons of language, rules about how words should be interpreted in context, one can quickly become

entangled in minutiae. These canons, developed over time to guide interpretation, are not inherently flawed. However, when applied excessively or mechanically, they shift focus away from the obvious. A sentence that would otherwise be plainly understood becomes a puzzle to be dissected, its meaning obscured by competing rules about grammar, structure, and implied intent. In such cases, the interpreter is no longer reading for understanding, but for compliance with abstract principles. Sometimes the tail can wag the dog. The damage intensifies when these semantic canons conflict. One canon might suggest a narrow reading of a term, while another encourages a broader contextual interpretation. Yet another canon might prioritize the placement of words over their common usage. When these canons collide, they often fail to resolve the issue at hand. Instead of producing clarity, they create a stalemate, an interpretive gridlock where no single approach decisively prevails.

In a battle for meaning, courts frequently grapple with competing philosophies of interpretation: textualism, which focuses strictly on the words of a statute; originalism, which seeks to understand the intent of those who wrote it; and strict constructionism, which insists on a limited, literal reading. Each approach claims legitimacy, yet they often lead to

different conclusions when applied to the same text. The result is not a unified method of interpretation, but a fragmented landscape where outcomes depend as much on the chosen theory as on the language itself. This multiplicity of frameworks can make reaching a final resolution exceedingly difficult. Legal arguments become less about what the words reasonably mean and more about which interpretive lens should dominate. In effect, the semantic cannon has been fired, and everyone within range must contend with the fallout: confusion, delay, and sometimes contradictory conclusions.

The irony is that language, at its core, is meant to communicate clearly and efficiently. Most people, in everyday life, interpret words without consulting a hierarchy of canons or philosophical doctrines. They rely on context, shared understanding, and common sense. More times than not, this approach works and people conduct their daily lives without a second thought about meaning, context, or usage. The lesson, then, is not to abandon interpretive tools altogether, but to resist the urge to overuse them. When every sentence becomes a battlefield of competing theories, the clear meaning is easily lost. Rather than expending excessive effort navigating a maze of linguistic principles, it is often

better to step back and ask a simpler question: What do these words plainly mean? In most cases, giving words their ordinary, straightforward meaning will suffice. Common sense, though less glamorous than a fully loaded semantic arsenal, tends to produce clearer and more consistent results. And unlike the semantic cannon, it rarely causes collateral damage. I would therefore encourage litigants to plead their case with precision, focused on material facts, buttressed by authoritative cases and persuasive arguments. When a matter is analyzed properly within our adversarial system, courts can resolve the matter at hand, and that resolution not only solves the immediate dispute between parties, but provides guidance in the form of precedent for future similarly situated parties.

MENDHEIM, Justice (dissenting).

I respectfully dissent.

We granted Altonio Spencer's petition for a writ of certiorari to consider the Court of Criminal Appeals' affirmance of his sentence for his pharmacy-robbery conviction. Specifically, Spencer's petition alleged, as a material question of first impression, that the "terms from the pharmacy robbery penalty statute, § 13A-8-52, Ala. Code 1975, ... are directly contrary to terms from the HFOA, § 13A-5-9, Ala. Code 1975, [and cannot] be applied to an HFOA sentence."

Section 13A-8-52, Ala. Code 1975, states:

"(a) Upon conviction of the criminal offense of 'pharmacy robbery' as defined in Section 13A-8-51(2), [Ala. Code 1975,] the offender shall be imprisoned at hard labor for not less than 10 years nor more than 99 years and shall be ineligible for consideration for parole, probation or suspension of sentence.

"(b) On a second or subsequent conviction under this article [i.e., the Pharmacy Robbery Act of 1982, §§ 13A-8-50 through -52, Ala. Code 1975], the offender shall be imprisoned for the remainder of his natural life and shall be ineligible for consideration for parole, probation or suspension of sentence."

By its plain language, § 13A-8-52 addresses two aspects of punishment for the crime of pharmacy robbery. There are distinct "shall" clauses in each subsection of § 13A-8-52, one "shall" clause regarding

37

length of sentence and one "shall" clause denying the trial court the discretion to consider the possibility of parole, probation, or suspension of sentence when the defendant has committed pharmacy robbery. Thus, the grammatical structure of § 13A-8-52, in addition to the fact that § 13A-8-52(b) does not simply use the normal language of "life without the possibility of parole," indicate that § 13A-8-52 is addressing two legislative concerns as to punishment specific to pharmacy robbery, the second being that parole, probation, or suspension of sentence will not be available for any conviction for pharmacy robbery. Simply put, a defendant convicted of pharmacy robbery is not to be given the opportunity to be released into the community before serving his or her full sentence. A trial court has no discretion in that regard.

The Habitual Felony Offender Act ("the HFOA"), § 13A-5-9, Ala. Code 1975, is a statute of general application providing for additional penalties, but that statute is not exclusive for purposes of sentence enhancement. See Moss v. State, [Ms. CR-2024-0272, Dec. 19, 2025] __ So. 3d __ (Ala. Crim. App. 2025) (applying the firearms enhancement in Ala. Code 1975, § 13A-5-6(a)(5), to increase the minimum sentence length under the HFOA). Thus, for purposes of sentencing, I do not believe that

38

the restriction on the trial court's discretion to consider the possibility of parole, probation, or suspension of sentence when the conviction is for pharmacy robbery may be ignored when applying the HFOA. The HFOA "was obviously enacted to allow more severe penalties to be assessed against persistent violators of the felony laws of the state" and, "at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time." Thompson v. State, 525 So. 2d 820, 824 (Ala. 1985). I cannot read a statute with those purposes as somehow granting a trial court discretion to consider the possibility of parole, probation, or suspension of sentence for the commission of a crime for which those benefits are not otherwise available.

Perhaps the easiest way to see the problem is by analyzing § 13A-5-9(a), which provides for sentencing a defendant who has one previous Class A, Class B, or Class C felony conviction. If that defendant then committed pharmacy robbery (a Class A felony) as his second felony, § 13A-5-9(a)(3) would apply and that defendant "must be punished by imprisonment for life or for any term of not more than 99 years but not less than 15 years." According to the rationale of the main opinion, this

39

means that a trial court that had no discretion to grant a defendant the possibility of parole, probation, or suspension of sentence for a 10-year to 99-year sentence under § 13A-8-52(a), assuming the defendant had never been convicted of a previous felony, nevertheless has discretion to grant parole, probation, or suspension of sentence because the defendant had been convicted a previous felony, even if the sentence at issue fell within the range stated in § 13A-8-52(a). Further, reading the HFOA as overriding limits on the trial court's discretion as to sentence enhancements or restrictions under § 13A-8-52 clearly would not be proper for purposes of § 13A-8-52(b), which mandates that for a second pharmacy-robbery conviction "the offender shall be imprisoned for the remainder of his natural life and shall be ineligible for consideration for parole, probation or suspension of sentence," while § 13A-5-9(a)(3), again, would provide that, on conviction of a second Class A felony, "he or she must be punished by imprisonment for life or for any term of not more than 99 years but not less than 15 years."

Criminal sentences are, in part, a deterrent, and a person who commits pharmacy robbery is on notice that he or she will not be eligible for "parole, probation or suspension of sentence." In light of the

40

legislature's express policy granting a trial court no discretion to provide for "parole, probation or suspension of sentence" as part of the punishment for pharmacy robbery, I cannot conclude that a defendant of ordinary intelligence and understanding might calculate: "Well, I've already committed multiple felonies, so if I get caught I still might be eligible for parole if I rob this pharmacy, particularly since I've never robbed a pharmacy before." The trial court correctly concluded that it had no discretion to include the possibility of parole as part of Spencer's sentence.

Wise, J., concurs.